UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
UTICA MUTUAL INSURANCE COMPANY,  :
  :
           PLAINTIFF,  :   NO. 6:12-CV-00196 (LEK/ATB)
  :
V.  :   <u>ORAL ARGUMENT REQUESTED</u>
  :
MUNICH REINSURANCE AMERICA, INC.,  :   **<u>REDACTED</u>**
  :
           DEFENDANT.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


### <u>UTICA MUTUAL INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO CONTINUE DISCOVERY</u>

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ...................................................................................................1

II.    BACKGROUND ...................................................................................................4

III.   ARGUMENT .........................................................................................................5

      A.     Utica Is Unable To Present Facts Relevant To The Terms Of The 1973
           Reinsurance Certificate. ..............................................................................6

      B.     Utica Is Unable To Present Facts Relevant To The Interpretation Of
           The 1973 Reinsurance Certificate. ..............................................................8

      C.     Utica Is Unable To Present Facts Relevant To The Interpretation Of
           The 1973 Umbrella Policy. ........................................................................12

      D.     Utica Is Unable To Present Facts Relevant To The Choice Of Law
           Analysis. .....................................................................................................15

      E.     Utica Is Unable To Present Facts Relevant To Whether MRA has
           Waived the Arguments in its Motion. .........................................................19

IV.    CONCLUSION.....................................................................................................20

## I.      INTRODUCTION

Utica submits this memorandum in support of its Motion to Continue Discovery under Federal Rule of Civil Procedure 56(d).

Utica seeks in excess of $3 million from Munich Reinsurance America, Inc. ("MRA") based on a reinsurance agreement (the "1973 Reinsurance Certificate") between Utica and American Re-Insurance Company ("American Re"), MRA's predecessor.[1]  The 1973 Reinsurance Certificate requires MRA to reimburse certain payments Utica makes for loss and expense under an insurance policy Utica issued to Goulds Pumps, Inc. (the "1973 Umbrella Policy").[2]

Procedurally, this litigation is in its preliminary stages.  The parties have engaged in limited written discovery.  Even as to that discovery, MRA has objected to a variety of requests by Utica.  The Court has not resolved MRA's objections.  Moreover, there have not been any depositions taken.

Notwithstanding the incomplete record, MRA has filed a motion for summary judgment asking the Court to dismiss all of Utica's claims.  (Dkt. No. 22).  MRA's motion is based on two grounds – (1) that the 1973 Umbrella Policy does not cover expense; and (2) that the 1973 Reinsurance Certificate caps MRA's obligation to reimburse expense at $5 million.

---

[1] "A certificate of reinsurance is a contract between two insurance companies in which the reinsured company [here, Utica] agrees to cede part of its risk to the reinsurer [here, American Re, now MRA] in return for a percentage of the premium."  *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 79 N.Y.2d 576, 582 (1992).

[2] Payments for loss include amounts paid for judgments or settlements for claims asserted against Goulds, Utica's policyholder.  Payments for expense relate to the defense of the claims, such as attorneys' fees for Goulds' defense counsel.

MRA's motion raises a number of issues that need to be resolved in discovery.  The most basic, yet critical, issue relates to the 1973 Reinsurance Certificate itself.  MRA has not produced a complete copy of the 1973 Reinsurance Certificate, and Utica has not located a copy.  But MRA has moved for summary judgment based on a specimen form, even though there is no admissible evidence in the record that the form was used as a part of the 1973 Reinsurance Certificate.  Indeed, MRA itself has acknowledged that it entered into reinsurance agreements that were not based on just a single specimen form, like the one it proffers here, thus, calling into question the very contract terms pursuant to which MRA seeks summary judgment. Compounding the problem, MRA objected to Utica's discovery requests about the terms of the 1973 Reinsurance Certificate.  And before Utica was even provided an opportunity to depose the relevant individuals with knowledge of the contract terms, MRA filed its motion.

The record upon which MRA asks this Court to resolve its motion is incomplete not only because MRA has not established the terms of the 1973 Reinsurance Certificate but also because the Court does not have, at this early stage, all of the extrinsic evidence needed to properly evaluate MRA's position.  At a minimum, MRA's and Utica's arguments demonstrate that the 1973 Umbrella Policy and the 1973 Reinsurance Certificate are ambiguous, requiring the Court to evaluate extrinsic evidence.  *See Barnes v. Am. Int'l Life Assurance Co. of N.Y.*, 681 F. Supp. 2d 513, 521 (S.D.N.Y. 2010) ("Where a contract (or an insurance policy) is ambiguous, the Court may look to extrinsic evidence to ascertain the intent of the parties.").  But even if the contracts were not patently ambiguous – as MRA claims but Utica disputes – the Court would nevertheless need to consider extrinsic evidence.  *See Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998) ("Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the

language of the contract is yet reasonably susceptible."); *Kerin v. U.S.P.S.*, 116 F.3d 988, 992 at

n.2 (2d Cir. 1997) (applying Connecticut law, which admits extrinsic evidence for contracts

without a patent ambiguity); *Fixture Specialists, Inc. v. Global Constr. Co. L.L.C.*, No. 07-5614,

2010 WL 4387548, *6 (D.N.J. Oct. 29, 2010) ("Under New Jersey law, extrinsic evidence is

admissible to aid in the interpretation of an integrated agreement even when the contract, on its

face, is free from ambiguity.").[3]

The extrinsic evidence at issue includes the industry custom and practice, which is

critical. *See World Trade Ctr. Props., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 186 (2d Cir.

2003) ("we have specifically instructed courts to consider the 'customs, practices, usages and

terminology as generally understood in the particular trade or business' in identifying ambiguity

within a contract"). Moreover, the parties' course of dealing is significant as well given that

MRA had previously paid the very amounts it inexplicably disputes now. *See Sanchez v. Maher*,

560 F.2d 1105, 1108 (2d Cir. 1977) ("Generally speaking, the practical interpretation of a

contract by the parties to it for any considerable period of time before it comes to be the subject

of controversy, is deemed to be of great, if not controlling, influence.").

 Given the outstanding discovery requests, the need for depositions, and remaining expert

discovery, at this stage, Utica is unable to present facts essential to justify its opposition.

Accordingly, the Court should deny MRA's motion.

---

[3] As shown below, California law may apply to the interpretation of the 1973 Umbrella Policy,
and Connecticut or New Jersey law may apply to the interpretation of the 1973 Reinsurance
Certificate. However, the record is devoid of the information needed to evaluate which
jurisdiction's law applies. And, at this stage, the Court cannot resolve the choice of law dispute
either, providing another reason to deny MRA's motion.

## II.      BACKGROUND

Utica served its document requests, interrogatories, and requests for admission on MRA on September 20, 2012.  (Ahmad Decl., Exs. 1-3).  As relevant to MRA's motion, Utica sought discovery about:  (1) the terms and conditions of the 1973 Reinsurance Certificate; (2) the proper interpretation of the 1973 Reinsurance Certificate; (3) the proper interpretation of the 1973 Umbrella Policy; (4) choice of law; and (5) whether Munich Re has waived the arguments in its motion.  (Ahmad Decl. ¶¶ 10, 12).

Rather than providing complete responses to all of Utica's discovery requests, MRA unilaterally decided that it would only respond to requests to the extent MRA believed the requests sought information relevant to MRA's anticipated motion for summary judgment.  (Ahmad Decl., Exs. 4-6).  Indeed, MRA's repeated objection to almost all of Utica's discovery requests was that the requests had "no bearing on . . . the two prongs of MRA's proposed motion for summary judgment and the sole topics for discovery at this time."  (*See*, *e.g.*, Ahmad Decl., Ex. 5 at Response to Request No. 3).

Counsel for Utica conferred with MRA's counsel and explained why MRA's objections to discovery were improper.  (Ahmad Decl. ¶ 10 & Ex. 8).  Nevertheless, MRA refused to withdraw its objections.  (*Id.* ¶ 11 & Ex. 9).

Utica raised the discovery dispute with the Court.  (Oct. 22, 2012 Text Minute Entry). Magistrate Judge Baxter, however, entered an order staying the discovery Utica was pursuing. (Ahmad Decl., Ex. 7 (Nov. 5, 2012 Text Order)).  Moreover, Magistrate Judge Baxter concluded that MRA could file its motion for summary judgment, and Utica would preserve its arguments under Rule 56(d), necessitating this motion.  (*Id.*).

## III.   ARGUMENT

Because discovery is not complete, Utica is unable to present facts essential to justify its opposition and therefore the Court should deny MRA's Motion for Summary Judgment.  Under Federal Rule of Civil Procedure 56(d), the Court may deny a motion for summary judgment if the nonmovant demonstrates that "it cannot present facts essential to justify its opposition."[4]  The nonmoving party "must be afforded a reasonable opportunity to elicit information within the control of his adversaries." *Jasco Tools, Inc. v. Dana Corp.* (*In re Dana Corp.*), 574 F.3d 129, 149-151 (2d Cir. 2009) (citation and internal quotation omitted).  Thus, "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 303-04 (2d Cir. 2003) (overruling district court decision granting summary judgment to defendant where plaintiff was denied discovery) (citation and internal quotation omitted); *see also id.* at 304 (nonmoving party should not be "railroaded into his offer of proof in opposition to summary judgment").  Rule 56(d) "should be applied with a spirit of liberality." *Holmes v. Lorch*, 329 F. Supp. 2d 516, 529 (S.D.N.Y. 2004) (citation and internal quotation omitted).

Utica is unable to present facts essential to justify its opposition as to five, critical, issues: (1) the terms and conditions of the 1973 Reinsurance Certificate; (2) the proper interpretation of the 1973 Reinsurance Certificate; (3) the proper interpretation of the 1973 Umbrella Policy; (4) choice of law; and (5) whether Munich Re has waived the arguments in its motion. Accordingly, the Court should deny MRA's motion.

---

[4] Prior to the 2010 amendments to the Federal Rules of Civil Procedure, the text currently in Rule 56(d) was contained in Rule 56(f).

### A.   Utica Is Unable To Present Facts Relevant To The Terms Of The 1973 Reinsurance Certificate.

Utica cannot present facts that are critical to MRA's motion about its obligations under the 1973 Reinsurance Certificate – namely, the actual terms and conditions of the 1973 Reinsurance Certificate.  As noted above, MRA has not produced, and Utica has not located, a copy of all of the terms in the 1973 Reinsurance Certificate.  (Utica Statement of Material Facts ("USMF") ¶ 40).[5]  Before the Court can rule on MRA's motion – ostensibly based on the 1973 Reinsurance Certificate – the Court needs to know the actual terms of the 1973 Reinsurance Certificate.  At this preliminary stage, the Court cannot determine the actual contract terms, requiring that the Court deny MRA's motion because it is premature.

To date, the only part of the 1973 Reinsurance Certificate that MRA has provided to Utica and the Court is the declarations page, which contains some of the terms of the parties' agreement.  That page states that the agreement includes "the general conditions set forth on the reverse side hereof. . . ."  (USMF ¶ 40)  Utica has not been able to locate a copy of those conditions, and accordingly, Utica requested that MRA produce those terms as well as "all documents and communications concerning the 'general conditions set forth on the reverse side' of the declarations page of the Certificate."  (Ahmad Decl., Ex. 5 at Request No. 24).  MRA, however, refused to produce any documents in response to this request.  (*Id.* at Response to Request No. 24).  Other discovery requests also seek information relevant to the terms and conditions of the 1973 Reinsurance Certificate, and MRA has objected to those requests also. (Ahmad Decl. ¶ 12 & Exs. 4-6).

---

[5] In this brief, Utica relies on its Statement of Material Facts in Support of its Opposition to MRA's Motion for Summary Judgment.  Utica has filed that Statement and the related Affidavits with its Motion to Continue Discovery for ease of reference.

Utica's discovery requests seek information relevant to the terms and conditions of the 1973 Reinsurance Certificate, which are essential for Utica to properly address MRA's arguments in its motion and for the Court to resolve the motion.  (Ahmad Decl. ¶ 12(d)).  It is elementary that a party seeking summary judgment based on the terms of an agreement must prove the actual terms in that agreement.  However, MRA has not provided the actual terms of the 1973 Reinsurance Certificate.  Instead, MRA has only provided a form conditions page apparently used by MRA at some point in connection with certain contracts.[6]  But MRA has not demonstrated through admissible evidence that the specimen form MRA relies on, in fact represents the 1973 Reinsurance Certificate.

This is not an academic issue because the mere fact that a specimen form may have been used at a particular time, without more, is insufficient to establish the actual terms of the 1973 Reinsurance Certificate.  MRA (formerly known as American Re) recognizes this, and in another case, when the opposing party attempted to rely on one of MRA's specimen forms, MRA provided the following explanation about the company's practices:

> Although the General Conditions form is a standard form used by American Re, there is no evidence that this form was drafted by American Re, <u>nor is there any evidence that American Re used this form with 'all' its facultative reinsurance certificates.</u>  On the contrary, Mr. Cavell testified that American Re's use of the General Conditions form in question was limited in time and that, even during the designated time period, <u>American Re wrote facultative reinsurance on other types of forms</u>.

(McDermott Decl., Ex. 1 ¶ 9 (emphasis added)).

---

[6] The hole punches on each page make clear that the specimen page is not the actual backside of the declarations page.  The copy of the declarations page has two holes punched at the top of the page and has no hole punches on the left side of the page.  The specimen page has no holes punched at the top of the page and has three holes punched on the left side of the page.

Utica seeks discovery into the very issues MRA identified above.  In other words, Utica needs to determine if the specimen form MRA has proffered, in fact, represents the terms of the 1973 Reinsurance Certificate.  Utica's inquiries may be addressed, in part, by MRA's documents, such as the company's records about which forms it used at various times.  But MRA has objected to producing any such material.  In addition, Utica needs to depose the relevant individuals at MRA, American Re, former Utica employees, and third parties who were involved in negotiating and obtaining the reinsurance provided in the 1973 Reinsurance Certificate to determine which terms were included in the agreement.[7]  (Ahmad Decl. ¶ 12(e), (f)).  Indeed, in the case discussed above, MRA itself relied on deposition testimony from "Mr. Cavell" about American Re's practices regarding the use of specimen forms, but Utica has been precluded from seeking such discovery here.

Given MRA's objections to Utica's discovery, and the subsequent stay entered by Magistrate Judge Baxter, Utica has been precluded from completing the discovery needed to determine which material terms were included in the 1973 Reinsurance Certificate.  Accordingly, the Court should deny MRA's Motion for Summary Judgment.  *See Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 304-05 (2d Cir. 2003) (reversing district court decision granting summary judgment to defendant where plaintiff was denied discovery).

**B.**     **Utica Is Unable To Present Facts Relevant To The Interpretation Of The 1973 Reinsurance Certificate.**

Utica is also unable to present facts relevant to the interpretation of the 1973 Reinsurance Certificate.  As set forth in Utica's brief in opposition to MRA's Motion for Summary Judgment,

---

[7] In their discovery responses, MRA identified the following individuals who may have knowledge about the terms of the 1973 Reinsurance Certificate: James Broedel and Edward Schwenzfeir.  (Ahmad Decl., Ex. 6 at Response to Interrogatory No. 2).

MRA is incorrect that the 1973 Reinsurance Certificate caps MRA's liability at the amount in the declarations page of the Certificate.  However, even if the Court does not reject MRA's interpretation, Utica's interpretation of the 1973 Reinsurance Certificate is at least reasonable.[8] Thus, under either Connecticut or New Jersey law (which allow extrinsic evidence to interpret the contract even in the absence of an ambiguity) or New York law (which allows extrinsic evidence to interpret ambiguous contracts, gives great weight to parties' pre-litigation conduct in interpreting contracts, and under which courts rely on certain extrinsic evidence to interpret unambiguous contracts), Utica is entitled to present extrinsic evidence to oppose MRA's motion.[9]

Utica served discovery requests seeking information relevant to the interpretation of the 1973 Reinsurance Certificate.  (Ahmad Decl. ¶ 12(b)).  The requests sought information about MRA's prior payments to Utica in addition to the amount on the declarations page of other reinsurance certificates and MRA's prior interpretation of provisions similar to those in the 1973 Reinsurance Certificate.  (*See*, *e.g.*, Ahmad Decl., Ex. 5 at Request Nos. 18, 25, 32, 33-37).  MRA refused to provide documents in response to these requests.  (*Id.* at Responses to Request Nos. 18, 25, 32, 33-37).

_____

[8] To avoid repetition, Utica incorporates here its arguments from its brief opposing MRA's summary judgment motion, in which Utica shows that MRA's interpretation is incorrect and that, at a minimum, Utica's interpretation is reasonable, rendering the contract ambiguous.

[9] *See Kerin*, 116 F.3d at 992 n.2 (applying Connecticut law, which admits extrinsic evidence to interpret contract provisions even if they are unambiguous on their face); *Fixture Specialists,* 2010 WL 4387548 at *6 ("Under New Jersey law, extrinsic evidence is admissible to aid in the interpretation of an integrated agreement even when the contract, on its face, is free from ambiguity."); *World Trade Ctr. Props.,* 345 F.3d at 184 (we have specifically instructed courts to consider the 'customs, practices, usages and terminology as generally understood in the particular trade or business' in identifying ambiguity within a contract"); *Barnes,* 681 F. Supp. 2d at 521 ("Where a contract (or an insurance policy) is ambiguous, the Court may look to extrinsic evidence to ascertain the intent of the parties.").

But a contracting party's prior interpretation of a contract, like MRA's here, is critical in determining the proper interpretation of a contract.  *See Sanchez*, 560 F.2d at 1108 ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy, is deemed to be of great, if not controlling, influence.") (citing *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118, (1913)); *Viacom Int'l,* 486 F. Supp. at 98 n.3 (S.D.N.Y. 1980) (interpreting contract and giving "great, if not controlling weight" to contracting parties' course of conduct).

Moreover, the limited extrinsic evidence that Utica has been able to present shows the fallacy with MRA's position.  Although MRA claims its total liability is capped at $5 million – the amount specified in the declarations page of the 1973 Reinsurance Certificate that applies to loss only – MRA has nevertheless paid Utica for the very amounts it now disputes:

- Under a certificate reinsuring a different umbrella policy that Utica issued to Goulds, MRA reimbursed Utica for expense in addition to the limits for loss payments.  (USMF ¶ 60).  The 1973 Reinsurance Certificate (as set forth by MRA) and that reinsurance certificate are identical in all material aspects.  *Compare* (Dkt. No. 22-3), *with* (USMF ¶¶ 53-56).

- Similarly, under a certificate reinsuring an umbrella policy that Utica issued to Burnham, MRA reimbursed Utica for expense in addition to the limits for loss payments.  (USMF ¶ 69).  The 1973 Reinsurance Certificate (as set forth by MRA) and that reinsurance certificate are also identical in all material aspects.  *Compare* (Dkt. No. 22-3), *with* (USMF ¶¶ 62-65).

MRA's course of conduct of paying expense consistent with Utica's position is significant because the contracting parties' course of conduct is entitled to "great, if not controlling" weight. *See Sanchez*, 560 F.2d at 1108; *Viacom Int'l, Inc.*, 486 F. Supp. at 98 n.3 (same).  Nevertheless, MRA has objected to Utica's discovery efforts regarding the basis for MRA's prior conduct, which is directly at odds with the position MRA asks the Court to accept.

Likewise, MRA's position is at odds with the overwhelming evidence of custom and practice. Robert M. Hall, a former General Counsel at MRA (formerly known as American Re), has opined that MRA's position in this litigation "is contrary to the custom and practice of the reinsurance industry." (McDermott Decl., Ex. 18 (Hall Report) ¶ 37). Mr. Hall also stated that, "based on his experience at [MRA] (including as Senior Vice President and General Counsel of [MRA]) and as confirmed by [MRA's] payment of expense in addition to the limit applicable to loss payment under the 1977 Certificate, [MRA's] position in this case is contrary to [MRA's] own custom and practice." (Id. ¶ 42).[10]

Accordingly, to properly oppose MRA's motion, Utica is entitled to pursue in discovery the relevant information about MRA's interpretation of the 1973 Reinsurance Certificate and similar agreements as well as the industry custom and practice. Because Utica has not been provided an opportunity to conduct that essential discovery, the Court should deny MRA's Motion for Summary Judgment. See Miller, 321 F.3d at 304-05 (2d Cir. 2003) (overruling

---

[10] See also Eugene Wollan, Sing a Song of Reinsurance, ARIAS-U.S. Quarterly (First Quarter 1999) ("The understanding in the reinsurance world since time immemorial has been that the reinsurer's share of expense is not charged against its limit of liability – in other words, the expense in addition to the limit."); Michael Goldstein, Bellefonte Lives, 8-10 Mealey's Litig. Rep. Reins. 9 (1997) (citing the "custom and practice of reinsurers providing coverage for expenses in addition to limits where the reinsured policy also covers expenses in addition to limits"); id. (noting that Bellefonte "was met by almost universal condemnation and in some quarters ridicule by insurance and reinsurance claims people"); P. Jay Wilker & Edward K. Lenci, Much Ado About Nothing:  A Response Regarding Bellefonte's Reach, 9-10 Mealey's Litig. Rep. Reins. 16 (1998) (stating that general custom and practice of industry is to pay expense in addition to limits for loss payments); id. ("The Bellefonte line of decisions has been criticized as being contrary to the general custom and practice of the industry."); id. (expressing frustration that facultative reinsurers rely on Bellefonte as the rule "from sea to shining sea"); Michael Goldstein, For Whom Does Bellefonte Toll? It Tolls for Thee, 9-7 Mealey's Litig. Rep. Reins. 12 (1998) (noting that Bellefonte "has roundly been criticized in the reinsurance industry" and that commentators criticized Bellefonte as "utterly at odds with decades-old custom and practice").

district court decision granting summary judgment to defendant where plaintiff was denied

discovery).

### C.  Utica Is Unable To Present Facts Relevant To The Interpretation Of The 1973 Umbrella Policy.

Utica is also unable to present facts relevant to the interpretation of the 1973 Umbrella

Policy.  As set forth in Utica's brief in opposition to MRA's Motion for Summary Judgment,

Utica properly made expense payments under that policy and MRA's interpretation of the policy

to the contrary is incorrect.  However, even if the Court does not reject MRA's interpretation,

Utica's interpretation of the 1973 Umbrella Policy is at least reasonable.[11]  Thus, under either

California law (which allows extrinsic evidence to interpret the contract even in the absence of

an ambiguity) or New York law (which allows extrinsic evidence to interpret ambiguous

contracts, gives great weight to parties' pre-litigation conduct in interpreting contracts, and under

which courts rely on certain extrinsic evidence to interpret unambiguous contracts), Utica is

entitled to present extrinsic evidence to oppose MRA's motion.[12]

Utica served discovery requests seeking information relevant to the interpretation of the

1973 Umbrella Policy, including about MRA's prior payments to Utica for expense payments

Utica made under the 1973 Umbrella Policy and MRA's payments to Utica under other

---

[11] To avoid repetition, Utica incorporates here its arguments from its brief opposing MRA's summary judgment motion, in which Utica shows that MRA's interpretation is incorrect and that, at a minimum, Utica's interpretation is reasonable, rendering the contract ambiguous.

[12] *See Morey*, 64 Cal. App. 4th at 912 (1998) ("Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible."); *World Trade Ctr. Props.,* 345 F.3d at 184 (we have specifically instructed courts to consider the 'customs, practices, usages and terminology as generally understood in the particular trade or business' in identifying ambiguity within a contract"); *Barnes*, 681 F. Supp. 2d at 521 ("Where a contract (or an insurance policy) is ambiguous, the Court may look to extrinsic evidence to ascertain the intent of the parties.").

reinsurance contracts for expense payments made under other umbrella policies containing "not covered by" language similar to that in the 1973 Umbrella Policy.  (Ahmad Decl. ¶ 12(c)).  For example, Utica requested that MRA produce "all documents and communications concerning Utica's billings under the Certificate," but MRA refused to produce any documents responsive to this request.  (Ahmad Decl., Ex. 5 at Request No. 6 & Response to Request No. 6).  As another example, Utica requested that MRA produce "all documents and communications concerning Munich Re's consideration, evaluation, and payment of Utica's November 15, 2007 and June 16, 2009 billings to Munich Re pursuant to the 1977 Certificate," but MRA refused to produce any documents responsive to this request notwithstanding that under 1977 Certificate, MRA reimbursed expense payments that Utica had made under the 1977 Umbrella Policy, which contained similar "not covered by" language to that in the 1973 Umbrella Policy.  (Ahmad Decl., Ex. 5 at Request No. 33 & Response to Request No. 33).  Moreover, Utica needs to conduct discovery regarding Goulds' understanding of the 1973 Umbrella Policy terms and Utica's obligations thereunder.

As described above, a contracting party's interpretation of a contract, like Utica's or Goulds', is critical in determining the proper interpretation of a contract.  *See Sanchez*, 560 F.2d at 1108 ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy, is deemed to be of great, if not controlling, influence.") (citing *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118, (1913)); *Viacom Int'l,* 486 F. Supp. at 98 n.3 (S.D.N.Y. 1980) (interpreting contract and giving "great, if not controlling weight" to contracting parties' course of conduct).

Here, the limited extrinsic evidence that Utica has been able to present shows that Utica's and Goulds' understanding is contrary to the position MRA asks this Court to adopt.

13

Specifically, Utica's understanding as to its obligation to pay expense is clear – Utica paid expense on behalf of Goulds under the 1973 Umbrella Policy. (USMF ¶ 20). Utica also paid expense on Goulds' behalf under the 1977 through 1982 umbrella policies, which contain nearly identical "not covered by" language. (USMF ¶¶ 23-24).

Like Utica, Goulds understood that Utica would pay expense under the umbrella policies pursuant to the "not covered by" language. (USMF ¶¶ 27-29 ████████████████████

████████████████████████████████████████

████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████

████████████████████████████████████

█████████████████████████████

██████████████████████). Moreover, Barry Bradshaw, Goulds' former general counsel responsible for Goulds' insurance program, believed that the umbrella policies in the 1970s covered expense costs. (USMF ¶ 30). He also understood "that the primary [policy] came in first and the umbrella policy would come in over the primary policy if it were used" and that he "wanted to make sure that the coverage was uniform from bottom to top." (USMF ¶¶ 30-31).[13]

---

[13] MRA does not dispute that the 1973 Primary Policy covered expense and, thus, Mr. Bradshaw's testimony demonstrates that Goulds' intent was that the 1973 Umbrella Policy covered expense. MRA also provides no evidence that Goulds or Utica sought to remove coverage for expense from the 1973 Umbrella Policy after providing for coverage of expense under the umbrella policies Utica issued to Goulds during all of the preceding years.

Finally, MRA itself had paid the very expense payments it now disputes. MRA's payments under the 1973 Reinsurance Certificate include amounts paid to Utica for Utica's expense payments under the 1973 Umbrella Policy. (USMF ¶ 47). MRA also reimbursed Utica for expense payments made under similar "not covered by" language in umbrella policies issued to Goulds and Burnham. (USMF ¶¶ 60, 69, 72). Therefore, MRA's argument now that the 1973 Umbrella Policy does not cover expense is directly contrary to MRA's prior reimbursement of Utica's expense payments under the 1973 Umbrella Policy and other umbrella policies containing similar "not covered by" language.

Utica's and Goulds' course of conduct described above is significant because the contracting parties' actions are entitled to "great, if not controlling" weight. *See Sanchez*, 560 F.2d at 1108; *Viacom Int'l, Inc.*, 486 F. Supp. at 98 n.3 (same). Nevertheless, MRA has objected to Utica's discovery efforts related to MRA's prior conduct, and Utica has not been provided an opportunity to explore through third-party discovery Goulds' intent and understanding related to the 1973 Umbrella Policy.

Accordingly, to properly oppose MRA's motion, Utica is not entitled to conduct the discovery described above related to the interpretation of the 1973 Umbrella Policy. Because Utica has not been able to conduct that discovery, the Court should deny MRA's Motion for Summary Judgment. *See Miller*, 321 F.3d at 304-05 (overruling district court decision granting summary judgment to defendant where plaintiff was denied discovery).

### D. Utica Is Unable To Present Facts Relevant To The Choice Of Law Analysis.

Utica is unable to present facts relevant to the choice of law analysis for interpreting the 1973 Reinsurance Certificate. To interpret these contracts, the Court must first conduct a choice of law analysis. As set forth in Utica's brief in opposition to MRA's Motion for Summary

Judgment, New York law (as set forth by MRA and which MRA claims governs) conflicts with the laws of other jurisdictions that may apply – namely, Connecticut and New Jersey law.

Accordingly, the Court must evaluate the following factors from section 188 of the Restatement to determine which state's law applies:  (1) the place the Certificate was made; (2) the place the Certificate was negotiated; (3) the place of performance; (4) the location of the Certificate's subject matter; and (5) the domicile, residence, nationality, place of incorporation and place of business of MRA.  *See Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1069 (N.Y. 1994) (setting forth factors in Restatement § 188).  Utica served discovery requests seeking information relevant to these factors but MRA has, for the most part, objected to the requests.  (Ahmad Decl. ¶ 12(a) & Exs. 5, 6).

For example, with respect to the 1973 Reinsurance Certificate, Utica requested that MRA produce:

> All documents and communications concerning the locations from which Munich Re negotiated and issued the Certificate and from which Munich Re reviewed and evaluated Utica's reinsurance billings under the Certificate, including making payments for the billings.

(*Id.*, Ex. 5 at Request No. 38).  MRA responded as follows:

> MRA objects to this Request on the ground that it seeks documents concerning matters that have no bearing on a) the limit of the reinsurance accepted as stated in the reinsurance certificate; and b) the inapplicability of the purported March 1, 1974 Endorsement on the ground that the underlying occurrences were covered by Utica's primary policies, which are the two prongs of MRA's proposed motion for summary judgment and the sole topics for discovery at this time. Without waiving these objections, MRA will produce its underwriting file for the Certificate.

(*Id.* at Response to Request No. 38).  Utica is entitled to a full response to this request, including the production of <u>all</u> documents concerning the locations from which MRA negotiated and issued the Certificate (whether or not those documents are in MRA's "underwriting file") and <u>all</u> documents concerning the locations from which MRA reviewed and evaluated Utica's

16

reinsurance billings.  In order to oppose MRA's motion, all documents responsive to this request are essential because the requested information will determine which jurisdiction's law may apply to the issues MRA has raised in its motion.

The information Utica sought in discovery is essential for properly evaluating which jurisdiction's law governs the parties' rights and obligations.  With respect to the 1973 Reinsurance Certificate, the limited record actually shows that Connecticut or New Jersey law may apply, not New York law, as MRA contends.  The first two factors (where the agreement was made and negotiated) appear to weigh in favor of Connecticut law because MRA's employee responsible for negotiating, placing, and agreeing to the terms of the Certificate was located in Connecticut in 1973.  (Dkt. No. 22-5; McDermott Decl., Exs. 3, 4).  *See Arkwright-Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co.*, 887 F.2d 437, 439 (2d Cir. 1989) (finding that Certificate was issued in North Carolina where reinsurance group was organized in North Carolina); *TIG Premier Ins. v. Hartford Accident & Indemn.*, 35 F. Supp. 2d 348, 350 (S.D.N.Y. 1999) (finding that Certificate was issued in California where reinsurer was apparently located in California); *Jefferson Ins. Co. Of N.Y. v. Fortress Re, Inc.*, 616 F. Supp. 874 (S.D.N.Y. 1984) (finding that Certificate was issued in North Carolina where reinsurer's offices were in North Carolina); *Folksam. Reins. Co. v. Republic Ins. Co.*, No. 03 Civ. 0402, 2003 WL 22852737 (S.D.N.Y. Dec. 2, 2003) (finding that Certificates were issued in New York where reinsurer's representative counter-signed the Certificates), *supplemented by* 2004 WL 936760 (S.D.N.Y. Apr. 29, 2004), *vacated on other grounds and remanded by* 182 F. App'x 63 (2d Cir. 2006); *id.* (finding that Certificates were negotiated at reinsurer's office in New York notwithstanding that cedent and broker were in Texas).

The third factor (the place of performance) weighs in favor of New Jersey law because MRA and its employees are currently located in New Jersey, MRA reviewed Utica's billings in New Jersey, and MRA made its payments from New Jersey.  (McDermott Decl., Exs. 5, 12; Ex. 14 at 3).  *See Arkwright-Boston Mfrs*, 887 F.2d at 439 (finding that obligation to perform arose in North Carolina upon presentation to reinsurance group in North Carolina); *Jefferson Ins. Co.*, 616 F. Supp. 874 (finding that obligation to perform arose in North Carolina upon presentation of claim to reinsurer in North Carolina).

The fourth factor (the location of the Certificate's subject matter) does not weigh in any states' favor because the payments that Utica made for the underlying asbestos claims for which Utica seeks reimbursement from MRA were made across the nation. The fifth and final factor (the domicile, residence, nationality, place of incorporation and place of business of Utica and MRA) also does not appear to weigh in any state's favor.  Although Utica is and was incorporated in New York, the available evidence shows that MRA negotiated the terms of the 1973 Reinsurance Certificate from Connecticut and MRA is currently incorporated in Delaware and has its current principal place of business in New Jersey.  (Dkt. No. 1 ¶2; Dkt. No. 11 ¶ 2).[14]

Accordingly, on the existing record, MRA's argument that New York law applies raises factual issues as to which Utica is entitled to discovery.  Because Utica has not been able to conduct that discovery, the Court should deny MRA's motion.  *See AIU Ins. Co. v. TIG Ins. Co.*, No. 07 Civ. 7052, 2010 WL 882879, at *1 (S.D.N.Y. Mar. 9, 2010) (vacating magistrate judge's report and recommendation regarding interpretation of reinsurance contract where reinsured

---

[14] Likewise, MRA ignores in its motion the relevant factors to determine which state's law governs the interpretation of the 1973 Umbrella Policy.  Indeed, in the litigation between Utica and Goulds regarding the insurance policies Utica issued, Goulds had argued that California law applied on at least some issues.  (USMF ¶ 29).

contended it had not taken sufficient discovery to oppose summary judgment on choice of law issue), *vacating in part* 2010 WL 850181 (S.D.N.Y. Feb. 11, 2010).

### E.   Utica Is Unable To Present Facts Relevant To Whether MRA has Waived the Arguments in its Motion.

In addition, Utica has not been able to conduct discovery regarding its waiver defense. As shown in Utica's brief opposing MRA's motion, even if the Court were to accept MRA's arguments, the Court should nevertheless deny the motion because MRA has waived both arguments. *See Albert J. Schiff Assocs., Inc. v. Flack*, 417 N.E.2d 84, 87 (N.Y. 1980) (waiver means "a voluntary and intentional relinquishment of a known right").  The Court can find waiver based on direct or circumstantial proof, including an implied waiver "when there is an intention to waive unexpressed, but clearly to be inferred from circumstances…." *Id.* Connecticut and New Jersey law is in accord.  *See D'Amico v. Manson*, 476 A.2d 543, 545 (Conn. 1984); *Knorr v. Smeal*, 836 A.2d 794, 799 (N.J. 2003).

Here, the Court should infer from the circumstances that MRA has waived the two arguments it advances now.  Specifically, with respect to the "not covered by" language, MRA has consistently reimbursed Utica for expense payments made under the 1973 Umbrella Policy and reimbursed Utica for expense payments made pursuant to the same language in other umbrella policies.  (USMF ¶¶ 47, 60, 69, 72).  Likewise, notwithstanding its proffered interpretation of the 1973 Reinsurance Certificate capping its obligations at the limit that applies to loss, MRA has previously paid Utica expenses above that limit.  (USMF ¶¶ 60, 69).  Other than in the context of the dispute resulting in this lawsuit, MRA has not withheld reimbursement of the very same amounts it challenges now.  Accordingly, the Court should find that MRA has waived the arguments in its motion.

To the extent that MRA argues that waiver may not apply because of what it knew or did not know when it made the payments it now disputes, Utica is entitled to discovery regarding MRA's handling of Utica's other billings.  The specific discovery that Utica will need will necessarily depend on MRA's arguments related to Utica's waiver defense.

## IV.  CONCLUSION

Accordingly, as shown above, the Court should rule that MRA's motion is premature, a decision based on the incomplete record at this stage is improper, and Utica should be entitled to all facts essential to its opposition to MRA's motion for summary judgment.


Dated:  January 8, 2013                              Respectfully submitted,

                                                     /s/ Walter J. Andrews
                                                     Walter J. Andrews
                                                     N.D.N.Y Bar No. 106051, *admitted pro hac vice*
                                                     Syed S. Ahmad
                                                     N.D.N.Y. Bar No. 602911
                                                     Hunton & Williams LLP
                                                     1751 Pinnacle Drive, Suite 1700
                                                     McLean, Virginia 22102
                                                     Telephone: (703) 714-7400
                                                     wandrews@hunton.com
                                                     sahmad@hunton.com

                                                     *Counsel for Utica Mutual Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 8, 2013, a copy of the foregoing was electronically filed with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the attorneys listed below.

Bruce M. Friedman
Gerald A. Greenberger
Rubin, Fiorella & Friedman LLP
630 Third Avenue, 3rd Floor
New York, New York 10017
(212) 953-2381
(212) 953-2462
BFreidman@RubinFiorella.com
GGreenberger@RubinFiorella.com

*Attorneys for Defendant*
*Munich Reinsurance America, Inc.*

<u>/s/ Patrick McDermott</u>
Patrick McDermott

Not Reported in F.Supp.2d, 2010 WL 882879 (S.D.N.Y.)
**(Cite as: 2010 WL 882879 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.
AIU INSURANCE COMPANY, Plaintiff,
v.
TIG INSURANCE COMPANY, Defendant.

No. 07 Civ. 7052(SHS).
March 9, 2010.

*ORDER*

SIDNEY H. STEIN, District Judge.

**\*1** Because the parties' submissions dated February 25, and March 8, 2010, demonstrate that discovery is still being conducted, I conclude that consideration of defendants' motion for partial summary judgment is premature at this stage, except to the extent that factual matters are not in dispute. Accordingly,

IT IS HEREBY ORDERED that except to the extent it recommends that summary judgment be granted for TIG on the issue of whether TIG provided reinsurance coverage for the period from October 1, 1981 through October 1, 1982, Magistrate Judge Pitman's Report and Recommendation dated February 11, 2010, is vacated without prejudice to a renewed motion for summary judgment at the conclusion of discovery. The Report and Recommendation is adopted only with respect to its recommendation that summary judgment be granted in TIG's favor on the issue of whether TIG provided reinsurance coverage for the period from October 1, 1981 through October 1, 1982.

SO ORDERED:

S.D.N.Y.,2010.
AIU Ins. Co. v. TIG Ins. Co.
Not Reported in F.Supp.2d, 2010 WL 882879

(S.D.N.Y.)

END OF DOCUMENT

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
FOLKSAMERICA REINSURANCE COMPANY,
Successor-in-interest of Mony Reinsurance Corporation, Plaintiff
v.
REPUBLIC INSURANCE COMPANY, Defendant.
REPUBLIC INSURANCE COMPANY,
Third–Party Plaintiff,
v.
AON CORPORATION, Aon Re Worldwide, Inc.,
Aon Services Group, Inc. and Aon Specialty Re,
Inc. Third–Party Defendants.

No. 03 Civ. 0402(HB).
Dec. 2, 2003.

**Background:** Reinsurer sought declaration of its contractual obligations to insurer for insureds' asbestos and silicosis-related injuries. Parties cross-moved for summary judgment.

**Holdings:** The District Court, Baer, Jr., J., held that:
(1) New York law applied;
(2) reinsurer was not relieved from liability, despite insurer's alleged breach of contractual obligation to provide prompt notice when it raised its loss reserves over fifty percent, absent showing of prejudice; and
(3) fact issue existed as to whether insurer acted with requisite promptness when providing reinsurer with definitive statement of loss.

Plaintiff's motion denied; defendant's motion granted in part and denied in part.

West Headnotes

**[1] Insurance 217 ⋘1091(14)**

217 Insurance

217III What Law Governs
217III(A) Choice of Law
217k1086 Choice of Law Rules
217k1091 Particular Applications of Rules
217k1091(14) k. Reinsurance. Most Cited Cases

Under New York choice of law rules, New York law was applicable to dispute over whether insurer had provided reinsurer with requisite notice of claims; though insurer and insured risk were in Texas, reinsurance certificates had been issued in New York and any demand for payment had to be made there.

**[2] Insurance 217 ⋘3624**

217 Insurance
217XXXII Reinsurance
217k3622 Claims and Settlement Practices
217k3624 k. Claim Procedures. Most Cited Cases

Provision in reinsurance certificate, requiring notice to reinsurer when insurer raised its reserves over fifty percent, was not condition precedent to reinsurer's liability; provision did not set out number of days that sufficed for prompt notice, did not expressly state that reinsurer did not have to establish prejudice, and did not clearly provide that reinsurer would be relieved of liability should prompt notice not be provided.

**[3] Insurance 217 ⋘3624**

217 Insurance
217XXXII Reinsurance
217k3622 Claims and Settlement Practices
217k3624 k. Claim Procedures. Most Cited Cases

Under New York law, reinsurer was not relieved from liability, despite insurer's alleged breach of contractual obligation to provide prompt notice when it raised its loss reserves over fifty percent; obligation was not condition precedent, and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

there was no showing that alleged breach caused reinsurer to suffer any actual prejudice in form of tangible economic harm.

**[4] Insurance 217 ⟋3624**

217 Insurance
   217XXXII Reinsurance
      217k3622 Claims and Settlement Practices
         217k3624 k. Claim Procedures. Most Cited Cases

Under New York law, condition precedent in third tier reinsurance certificate, that insurer promptly provide reinsurer with definitive statement of loss, only applied when claim loss became so significant that reinsurance was actually invoked.

**[5] Federal Civil Procedure 170A ⟋2501**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2501 k. Insurance Cases. Most Cited Cases

Issue of material fact as to whether insurer acted with requisite promptness when providing reinsurer with definitive statement of loss precluded summary judgment in suit to determine whether reinsurer was relieved of its liability to insurer.

AMENDED

BAER, J.

*OPINION & ORDER*

**\*1** Plaintiff Folksamerica Reinsurance Co. ("Folksamerica"), in its action for a declaratory judgment, moves pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 56(c) for summary judgment against defendant Republic Insurance Co. ("Republic"). Republic cross-moves for summary judgment against Folksamerica. Third party defendants Aon Corp., Aon Re Worldwide, Inc., Aon Services Group, Inc., and Aon Specialty Re, Inc.[FN1] (collectively "Aon") move for summary judgment

against Republic and Folksamerica. Republic also moves to strike certain paragraphs of Folksamerica's summary judgment declarations and Folksamerica's entire Rule 56.1 statement in opposition to Republic's motion for summary judgment, and for sanctions with regard to Folksamerica's violations of Fed.R.Civ.P. 36(b). For the foregoing reasons, Republic's motion for summary judgment is granted-in-part and denied-in-part, and all other motions are denied.

> FN1. On October 8, 2003, the parties stipulated to a dismissal of all claims asserted by Folksamerica and Republic against two of the four Aon entities: Aon Corporation and Aon Services Group. Therefore, future references to Aon only concern the remaining two entities, Aon Re Worldwide, Inc. and Aon Specialty Re, Inc.

I. BACKGROUND
A. Overview of Reinsurance

As an understanding of reinsurance, and the way in which it differs from insurance, is central to this case, before turning to the facts of the instant matter, it may be worthwhile to summarize the basic tenets of reinsurance, borrowing liberally from the clearly stated introduction contained within the decade old but oft-cited Second Circuit opinion in *Unigard*.

> Reinsurance occurs when one insurer (the "ceding insurer" or "reinsured") "cedes" all or part of the risk it underwrites, pursuant to a policy or group of policies, to another insurer. *See* 13A John A. Appleman & Jean Appleman, Insurance Law and Practice § 7681, at 480 (1976); 19 George J. Couch, Cyclopedia of Insurance Law § 80:1, at 624 (2d ed.1983). The reinsurer agrees to indemnify the ceding insurer on the risk transferred.

> There are two basic types of reinsurance policies—facultative and treaty. *See generally* 1 Klaus Gerathewohl, Reinsurance Principles and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

Practice 64–128 (1980) (discussing various types of reinsurance coverage). In facultative reinsurance, a ceding insurer purchases reinsurance for a part, or all, of a single insurance policy. Treaty reinsurance covers specified classes of a ceding insurer's policies. As the district court explained, a "typical treaty reinsurance agreement might reinsure losses incurred on all policies issued by the ceding insurer to a particular insured, while facultative reinsurance would be limited to the insured's losses under a policy or policies specifically identified in the reinsurance agreement." *Unigard,* 762 F.Supp. at 572 n. 2.

The reinsurer is not directly liable to the original insured. *See Unigard,* 79 N.Y.2d at 582, 584 N.Y.S.2d 290, 594 N.E.2d 571. Reinsurance involves contracts of indemnity, not liability. *Id.* at 582–83, 584 N.Y.S.2d 290, 594 N.E.2d 571. Reinsurers do not examine risks, receive notice of loss from the original insured, or investigate claims. *Id.* at 583, 584 N.Y.S.2d 290, 594 N.E.2d 571. In practice, the reinsurer has no contact with the insured.

Reinsurance works only if the sums of reinsurance premiums are less than the original insurance premium. Otherwise, the ceding insurers will not reinsure. For the reinsurance premiums to be less, reinsurers cannot duplicate the costly but necessary efforts of the primary insurer in evaluating risks and handling claims. Reinsurers may thus not have actuarial expertise, *see Delta Holdings,* 945 F.2d at 1241, or actively participate in defending ordinary claims. They are protected, however, by a large area of common interest with ceding insurers and by the tradition of utmost good faith, particularly in the sharing of information.

**\*2** *Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.,* 4 F.3d 1049, 1053–54 (2d Cir.1993). The parties to this action intended to interact consistent with this general policy of good faith; however, a computer coding error made by Aon's predecessor, RFC, and perpetuated by Aon, resulted in Aon's inadvertent failure to recognize Republic's third-layer of reinsurance. Haley Decl. Exh. F ("RFC converted claims to its sister company's (Intere's [computer] ) system. For some unknown reason, *the third layer* of the contract for this account *did not convert. Only the first and second layers converted."* ) (emphasis added). As a result, although Republic forwarded notices to Aon, with the instruction that such notices be sent to all reinsurers, Aon failed to transmit these notices to Folksamerica. Consequently, the parties now ask the Court to interpret the reinsurance contracts that define their relationship in order to determine the consequences of these mishaps.

B. Factual Background

This dispute involves the repercussions of late notice of claims or occurrences under three identical facultative reinsurance certificates ("the Certificates"). This Court must determine whether Folksamerica should be released from its obligation to reinsure Republic due to Republic's alleged failure to provide "notice," [FN2] as mandated by the Certificates.

> FN2. While Folksamerica characterizes all deficiencies by Republic as failures to provide timely notice, a large part of this dispute involves a determination as to which of these alleged violations in fact pertain to notice.

Folksamerica acquired its reinsurance obligations to Republic, pursuant to a transfer and assumption agreement, effective December 31, 1991, wherein Folksamerica assumed the assets and liabilities of Mony Reinsurance Corporation ("Mony Re"). The assets and liabilities that are relevant to this dispute consist of (1) two facultative reinsurance certificates covering Republic's policies of insurance with J.T. Thorpe Co., Inc. ("Thorpe"), a masonry and insulation contractor, [FN3] and (2) one facultative reinsurance certificate covering Republic's policy of insurance with Clemtex, Ltd. ("Clemtex"), a supplier and/or manufacturer of sandblasting products. [FN4] Notably, Mony Re, not

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

Folksamerica, negotiated these three contracts –Folksamerica simply acquired the obligations that had been crafted by its predecessor.

> FN3. The applicable facultative reinsurance certificates are Facultative Casualty Reinsurance Certificate Number C13043, covering a Thorpe policy, for the period July 1, 1982 through July 1, 1983, and Facultative Casualty Reinsurance Certificate Number C14009, covering a Thorpe policy for the period July 1, 1983 through July 1, 1984.

> FN4. The applicable facultative reinsurance certificate is Facultative Casualty Reinsurance Certificate Number C10987, covering a Clemtex policy, for the period February 14, 1979 through February 14, 1980.

As a result of personal injury suits filed against both Thorpe and Clemtex, arising out of asbestos and silicosis-related injuries, Republic, the primary insurer of Thorpe and Clemtex, became exposed to millions of dollars in potential liability. Republic had several layers of reinsurance to cover its losses – with Folksamerica at the highest level – liable only after Republic's losses reached pre-proscribed catastrophic levels. Therefore, Folksamerica was not liable when suits first commenced—its exposure arose years later when in the aggregate the losses attained significant levels. However, before the time that Folksamerica's reinsurance obligation attached, Republic sent notices, including further documentation to all reinsurers, with regard to claims under both the Thorpe and Clemtex policies, regardless of whether such submissions were required under the specific language of each reinsurance contract. Although notice at that time was likely mandatory under some agreements, Republic's notice obligation to Folksamerica, had not yet accrued, as Republic only had the duty to notify Folksamerica when it raised its reserves, with respect to these policies, above fifty percent. Unlike primary insurers or even lower level reinsurers, en-

tities such as Folksamerica, who indemnify upper levels of loss, typically require notice only after certain trigger events have occurred, which signal to them that indemnification is imminent. Such notice serves as a forecast of potential liability and allows the reinsurer to plan and allocate properly.

**\*3** The Certificate language also mandates that the insurer provide the reinsurer with a definitive statement of loss ("DSOL") on all serious claims and occurrences, brought under the Certificates. The DSOL consists of particular documents from the claims file, that substantiate that the aggregate of claims warrants reinsurance, and allows the reinsurer to investigate the claims if it so chooses. The parties disagree as to how to classify the DSOL provision – either as a notice clause or as a billing supplement, and therefore also dispute when Republic acquired the obligation to submit the DSOL under each Certificate.

Republic's obligations to Folksamerica under the Certificates are further complicated by the involvement of a reinsurance broker or intermediary, who facilitated both the execution of the reinsurance and the transmission of claim documentation. The broker hired by Republic for these purposes was RFC Intermediaries, Inc. ("RFC"). Aon later succeeded to RFC's obligations, including RFC's duty to transmit reports to reinsurers, as per Republic's instructions—instructions which included orders to transmit notices to all reinsurers at several points over the years, regardless of the particular agreements in place with each reinsurer. In several instances, with regard to Folksamerica, despite orders from Republic, Aon failed to carry out this command, due to a glitch in its computer system, which hid the third layer (Folksamerica's layer) of reinsurance from Aon's view. Nonetheless, because Folksamerica also held a treaty reinsurance policy, previously maintained by Great Lakes American Reinsurance Company ("GLARC"), to indemnify Republic's Thorpe liability, Folksamerica received, in a timely fashion, certain documentation relevant to claims against Thorpe. However, these docu-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

ments only referenced Folksamerica's treaty reinsurance, not its facultative reinsurance.

Exactly when Republic's notice and DSOL obligations attached, whether Republic properly discharged such obligations, and if not, what the appropriate result should be, are the points of contention in this case—all of which depend upon a determination of the proper interpretation of the Certificates' language.

C. Procedural History

Folksamerica filed its complaint in this action on January 17, 2003, seeking a declaratory judgment as to its liability under the Certificates. On May 23, 2003, Republic filed a third-party complaint against the four Aon entities. Aon filed its answer on August 22, 2003, claiming, among other things, that it served as Folksamerica's agent for purposes of delivering notice, whereupon Folksamerica amended its complaint to assert claims against Aon as a result of Aon's alleged breach of such duty. Republic filed its motion for summary judgment on August 29, 2003, Folksamerica followed suit on September 22, 2003, and Aon completed the circuit on September 26, 2003. On October 8, 2003, the parties stipulated to the discontinuance of all claims against Aon Corp. and Aon Services Group, Inc., which left only two Aon entities in the suit. On October 20, 2003, Republic filed a motion to strike portions of various declarations submitted by Folksamerica in addition to Folksamerica's Rule 56.1 statement in opposition to Republic's motion for summary judgment, and for sanctions.[FN5] This Court heard oral arguments on October 24, 2003.

> FN5. The Court informed the parties at oral argument that it would not resolve these motions prior to a determination on the underlying summary judgment motions. This seemed the prudent course both because the motions were late and because it was my hope that for the most part the concerns voiced would be resolved by the Opinion. This proved to be correct with regard to

the prejudice issue. A review of the papers does not alter my views as expressed herein with regard to the choice of law issue. The prong that urges the imposition of sanctions is denied.

## II. DISCUSSION

A. Summary Judgment Standard of Review

**\*4** Pursuant to Fed.R.Civ.P. 56(c), a district court must grant summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.' ' *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), quoting Fed.R.Civ.P. 1.

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities and draw all inferences against the moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (*per curiam* ); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). However, the mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The disputed issues of fact must be "material to the outcome of the litigation" (*id. at* 11), and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to materiality, "substantive law will identify which facts are

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248.

"Summary judgment is particularly appropriate in resolving insurance coverage disputes, because the interpretation of an insurance policy presents a question of law." *Constitution Reins. Corp. v. Stonewall Ins. Co.,* 980 F.Supp. 124, 127 (S.D.N.Y.1997), *aff'd without opinion* 182 F.3d 899 (2d Cir.1999), citing *Freedom Gravel Prods., Inc. v. Michigan Mut. Ins. Co.,* 819 F.Supp. 275, 277 (W.D.N.Y.1993) (citation omitted). *See also Flair Broad. Corp. v. Powers,* 733 F.Supp. 179, 184 (S.D.N.Y.1990).

B. Choice of Law

[1] The parties disagree as to which state's law should apply to the present dispute; Folksamerica argues for the application of New York law, and Republic and Aon lobby for Texas law. In diversity actions, when conflicts exist between the rules of two states, courts apply New York's choice-of-law rules to resolve the conflicts. *See Klaxon Co. v. Stentor Elec. Mfg.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). With regard to contract cases, New York courts determine which state's law to apply using a "center of gravity" or "contacts" test that resolves the conflict based on which state has the greater interest in the litigation, as evident from factors such as "the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *See Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539 (2d Cir.1997). An examination of these factors suggests the application of New York law.

**\*5** Because reinsurance is a specialized form of business, contacts pertinent to reinsurance agreements differ from those that control with regard to other contracts, and even to those found to be most important in insurance disputes. With regard to re-insurance agreements, the state where the reinsurance certificate issued and the location where performance is expected, i.e. the place to which the ceding insurer must make its demand for payment, typically control for purposes of choice of law. *See Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.,* 979 F.2d 268, 274 (2d Cir.1992) (affirming district court's application of New York law, when district court based its determination on the fact that "the reinsurance contracts were negotiated, issued, and made in New York by a New York reinsurance company ... [and] New York would be the place of performance under the contracts.") (district court quotations from *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.,* 745 F.Supp. 150, 157 (S.D.N.Y.1990)); *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co. et al.,* 887 F.2d 437, 439 (2d Cir.1989) (North Carolina law applied because reinsurer was organized in North Carolina and "any obligation to perform on the reinsurance contract would seem to arise in North Carolina upon presentation of a claim to [the reinsurer]."); *Jefferson Ins. Co. of New York v. Fortress Re, Inc. et al.,* 616 F.Supp. 874, 877 (S.D.N.Y.1984) (Court applied law where Certificate was issued, obligation to perform arose, and offices of reinsurer were located, despite ceding insurer and location of risk in another state).

The contacts most relevant to the Certificates in this case mandate the application of New York law. First, Republic concedes that all three Certificates were "issued" in New York, when Dave Jessup, the Mony Re representative who handled the policies, counter-signed the Certificates that had already been signed by Republic's representative. Schultz Decl. ¶ 8; Jessup Decl. ¶¶ 2, 15. Additionally, the underwriting for the Certificates was performed out of Mony Re's New York office. Jessup Decl. ¶¶ 2, 13. Mony Re received payments of premiums for the reinsurance in its New York office. Jessup Decl. ¶ 10. Further, any claim for payment under the Certificates would have been presented to Mony Re's New York claim department, and payment would have been issued from

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

there. Id. at ¶¶ 3, 11; see *Arkwright–Boston Mfrs. Mut. Ins. Co.,* 887 F.2d at 439. Further, as notice is the sum and substance of this case, the fact that the Certificates mandate that notice be given to "the Reinsurer," which, practically speaking, translates to the provision of notice in New York, underscores the centrality of New York to the present dispute. FN6 Finally, while Republic underscores that negotiations concerning the layers of reinsurance and the amount of premiums occurred in Texas (Schultz Decl. ¶¶ 8–9), an assertion hotly debated by Folksamerica (Jessup Decl. ¶ 16), any negotiations concerning the Certificates themselves, which would necessarily include negotiations regarding the notice provisions, occurred at Mony Re's offices in New York (Jessup Decl. ¶ 13). As Folksamerica inherited the reinsurance obligations under the Certificates, it is noteworthy, though arguably not controlling, that Folksamerica is also a New York corporation. Am. Compl. ¶ 5.

> FN6. Republic counters almost all of Folksamerica's assertions of pertinent contacts through its presentation of the flip-sides of each claim. In this case, Republic asserts that "[i]f Republic failed to provide prompt notice (which is an allegation that it vigorously disputes), then any such failure occurred in Texas where the notices and other loss information were generated and sent to the reinsurance intermediary for transmission to Folksamerica." Memorandum of Law In Support of Republic's Motion For Summary Judgment ("Rep.Mem.") at 16. This Court disagrees. Where Republic generated the "notices and other loss information" is irrelevant because the Certificates mandate that Republic "notify the Reinsurer."

**\*6** Despite these obvious contacts with New York, Republic argues that Texas has a more significant interest in the present suit. In support, in addition to raising the counter-suppositions referenced *supra,* note 6, Republic argues that its office

responsible for handling these Certificates was in Texas (Schultz Decl. ¶ 5), as was it's broker, RFC's office (id.¶ 6). These contacts are not controlling in this dispute. First of all, the mere fact that Republic's offices are in Texas, when premium payments as well as notice of claims were to be sent to New York, is secondary. Further, while Republic's broker was located in Texas, and Republic may have negotiated with RFC in Texas, these negotiations are less central to the main dispute. FN7

> FN7. While these contacts are relevant to Republic's claim for indemnification against Aon, from Aon's failure to transfer prompt notice to Folksamerica, since Republic's claim against Aon is secondary to the dispute between Republic and Folksamerica, and may never be adjudicated if Folksamerica is held liable, contacts relevant to the primary claim between Folksamerica and Republic are controlling. Further, as none of the parties has asserted that a conflict exists between New York law and Texas law with regard to agency, and in particular, a reinsurance broker's potential liability stemming from its agency role, this Court need not conduct a conflict of law analysis on the issue of third-party liability. *See B. Lewis Prods. v. Angelou,* 01 Civ. 0530, 2003 U.S. Dist. LEXIS 12655, at *18 (S.D.N.Y. July 23, 2003) ("If there is no material conflict, a court is free to bypass the choice of law analysis and apply New York law.") (internal quotations and citations omitted).

In order to support its assertion that Texas law should apply, Republic relies most heavily on the fact that the location of the risk was in Texas. FN8 Rep. Mem. at 1314. Republic stresses that "insurance involves a 'special subset of contracts' and that the applicable law in insurance contract cases 'is the local law of the state which the parties understood was to be the principal location of the insured risk ...' " Rep. Mem. at 13, quoting *Zurich*

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

*Ins. Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 318, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994). While Republic is correct that the location of the risk is a critical element in a dispute over *primary insurance,* this factor is of significantly less relevance with regard to a reinsurance dispute—which involves the indemnification of the insurer by the reinsurer, and which is not directly affected by the underlying insured's location. *See Jefferson Ins. Co. of New* York, 616 F.Supp. at 877 ("If this was a suit on the underlying contract of insurance, this factor [place of risk] would weigh heavily. However, the interest of New York becomes more attenuated when the suit is premised solely on the reinsurance contract."). Because this case concerns reinsurance, not insurance, the location of the risk and locale of the claims or suits asserted against the underlying insured, are not dispositive. Therefore, between the New York contacts and greater interest, New York law must govern. FN9

FN8. Republic asserts that because Clemtex and Thorpe are both "Texas insureds," "[t]he underlying claims made against Thorpe and Clemtex, which form the basis of Republic's reinsurance claim against Folksamerica, are predominantly in Texas. Rep. Mem. at 14, citing Schultz Decl. ¶¶ 5, 7.

FN9. The parties go to great lengths—Republic even devoting half of its argument on summary judgment—to argue the choice of law issue because of its potential to proscribe the outcome of this declaratory judgment. Texas law and New York law potentially diverge on an important issue—whether a party must show prejudice from late notice when a reinsurance policy requires prompt notice as a condition precedent. New York does not require reinsurers to prove prejudice in such cases (*see Christiana Gen. Ins. Corp. of New York v. Great Am. Ins. Co.,* 979 F.2d 268,

272 (2d Cir.1992); *Unigard Ins. Co. v. North River Ins. Co.,* 79 N.Y.2d 576, 582, 584 N.Y.S.2d 290, 594 N.E.2d 571 (1992) ), while Texas does (at least in the insurance context) (*see Ins. Co. of No. Am. v. McCarthy Bros. Co.* 123 F.Supp.2d 373, 379 (S.D.Tex.2000)). For purposes of this analysis, I have assumed that Texas would adopt its insurance rule in the reinsurance context (as it would make little practical sense for the repercussion of late notice to be more lax in the reinsurance context, where notice is far less critical), and have concluded that New York law should apply.

C. "Notice" Provisions

While no one disputes that this case is about alleged late notice, Folksamerica posits an additional provision to be included under the notice umbrella that Republic and Aon classify otherwise. Therefore, the role of this Court is four-pronged: (1) to determine which provision(s) are notice provisions, (2) to determine whether those provisions require notice as a condition precedent to Folksamerica's duty to be bound by its reinsurance obligations, (3) to analyze the remainder of the contested provisions, even if not notice provisions in the prior sense, to determine whether Republic breached its duty to Folksamerica, and if so, (4) to determine the repercussions of any such violation.

Not only do the parties dispute whether one particular provision pertains to notice, but they also disagree as to whether the undisputed notice provision requires prompt notice as a condition precedent to liability. As a preliminary matter, the fact that the parties are not in accord as to whether a specific provision requires notice as a condition precedent, does not necessarily render the contract ambiguous. *See Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan et al.,* 7 F.3d 1091, 1094 (2d Cir.1993) ("Ascertaining whether or not a writing is ambiguous is a question of law for the trial court.") (citations omitted). Although it is true

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

that "a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning" (*id.*) (internal quotations and citations omitted), "a court may not [ ] find ambiguity" in a reinsurance contract "where none exists" ( *United Capital Corp. v. Travelers Indem. Co. of II.,* 237 F.Supp.2d 270, 274–75 (E.D.N.Y.2002)). And, as the "interpretation or construction of an insurance policy presents a question of law to be decided by the court" ( *McGinniss v. Employers Reins. Corp.,* 648 F.Supp. 1263, 1266 (S.D.N.Y.1986)), this Court has authority to determine, as a matter of law, the appropriate interpretation and construction of the language at issue.

1. Notice Provisions

**\*7** [2] The notice provisions (in bold) contained within the three relevant Certificates are identical, and include the following language relevant to Republic's obligations:

> A....The Company shall furnish the Reinsurer with a copy of its policy and all endorsements thereto and as a condition precedent agrees to notify the Reinsurer promptly of all changes which in any manner affect this Certificate of Reinsurance....
>
> \* \* \* \*
>
> C. As a condition precedent, the Company shall promptly provide the Reinsurer with a definitive statement of loss on any claim or occurrence reported to the Company and brought under the Certificate which involves a death, serious injury or lawsuit.[FN10] The Company shall also notify the Reinsurer promptly of any claim or occurrence where the Company has created a loss reserve equal to fifty (50) percent of the Company's retention specified in item 3 of the Declarations....

> FN10. Because of Folksamerica's reliance on the connection between the "as a condi-

tion precedent" language in the first sentence and the "also" connector in the second sentence, the first sentence, although not a notice provision, is quoted in this section for purposes of clarity.

Haley Decl. Ex. A. As is clear from reading the above language, although the Certificates explicitly require notice of changes in the policy *as a condition precedent,*[FN11] the Certificates do not expressly require prompt notice of a claim or occurrence where the Company created a loss reserve of fifty percent, *as a condition precedent.* However, despite the lack of textual support, Folksamerica asserts that the second provision also requires notice *as a condition precedent.*[FN12]

> FN11. Although Folksamerica asserts in its moving papers, that Republic did not provide prompt notice of changes to the policy, and lists the following events, which allegedly triggered this duty: (a) Republic's "drop down" in 1990 and alleged assumption of the coverage for one of Clemtex's insolvent primary insurers; (b) Republic's settlement of the declaratory judgment action against Thorpe in January 2001; and (c) the earlier than anticipated payout of funds, in 2001, under this settlement, with regard to Republic's settlement of the declaratory judgment action against Thorpe, Folksamerica fails to identify how any of these events served to "change" the policy. Folk. Mem. at 6, 9–10, 12, 16. Further, at oral argument, Folksamerica's counsel conceded, with regard to the "changes" provision, that "in the context of the issues on late notice under the facultative certificates it is irrelevant." Oral Arg't, 10/24/03, at 14:15–25—15:4. Therefore, as Folksamerica has rescinded its assertion that Republic breached this provision, this Court need not analyze this clause any further.

> FN12. Folksamerica relies heavily on

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)

**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

Judge Leisure's decision in *Constitution Reins. Corp.,* 980 F.Supp. 124, to support its theory that the provision about notice of loss reserves increases is a *condition precedent.* Folk. Mem. at 17. However, while the reinsurance Certificate there contained the identical notice provision, the issue of how to interpret the notice clause was never raised, nor did the Court discuss this issue in its Opinion. Rather, the Opinion centered largely on the provision requiring submission of a definitive statement of loss ("DSOL"), an issue about which there was no dispute. Therefore, *Constitution Reinsurance* lends no support to Folksamerica's argument that the notice clause is also a condition precedent.

Folksamerica supports its interpretation by asserting that the "as a condition precedent" language in the first sentence modifies the second sentence as well—as it contends is clear from the use of the word "also." FN13 Folk. Reply Mem. at 7–8 ("... we return to the text of the Mony Re certificates, which each establish, as a condition precedent for coverage, prompt notice under two circumstances, set forth in two adjoining sentences. [As a condition precedent, the Company shall promptly provide the Reinsurer with a definitive statement of loss on any claim or occurrence reported to the Company and brought under the Certificate which involves a death, serious injury or lawsuit. The Company shall also notify the Reinsurer promptly of any claim or occurrence where the Company has created a loss reserve equal to fifty (50) percent of the Company's retention specified in Item 3 of the Declarations."] ) (bracketed language in block quote) (footnotes omitted). Folksamerica's reading simply defies basic rules of sentence construction. Although it is true that the word "also," signifies another responsibility, it is not the case that the connector makes evidence that the responsibility is also a condition precedent. And, because "[c]ourts will interpret doubtful language as embodying a promise or constructive condition rather than an ex-

press condition" (*see Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.,* 86 N.Y.2d 685, 691, 636 N.Y.S.2d 734, 660 N.E.2d 415 (1995); Restatement [Second] of Contracts § 227(1), (3)), any doubt must be resolved against a finding of a condition precedent. "This interpretive preference is especially strong[,]" in cases such as this one, "when a finding of express condition would increase [and in this case mandate] the risk of forfeiture by the obligee." *Id.* Therefore, the general policy disfavoring forfeiture of contractual responsibilities dictates that this second sentence not be treated as a condition precedent.

> FN13. Remarkably, at oral argument, Folksamerica even asserted that the first two sentences comprise one sentence—despite the fact that this reading is contrary to both the express language and the punctuation. Oral Arg't, 10/24/03, 3–4 (THE COURT: But what I would like you to tell me if you would is what evidence [that] [sic] you presented to show that the sentence which seems to and [sic] [be a] central issue here about the "company shall also notify the reinsurer promptly of any claim or occurrence" would be read as a condition precedent by ceding companies entering into contracts with you or your predecessor.. MR. CAPUDER: Because, your Honor, the sentence that contains that language begins with the wording that a condition precedent—THE COURT: That sentence begins. I think I read you that sentence. I didn't see that. MR. CAPUDER: The sentence itself begins with the phrase that it is a condition precedent to hold to coverage.)

**\*8** Further, the fact that Mony Re, when drafting this Certificate, expressly made certain requirements condition precedents, implies that provisions that do not contain such express language should be interpreted differently. *See, e.g. Int'l Fid. Ins. Co. v. Rockland,* 98 F.Supp.2d 400, 412 (S.D.N.Y.2000) ("Sophisticated lawyers, such as those drafting

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

standard forms ... must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning."). When so much turns on how this second sentence is read, I cannot now add language that was not apparent upon signing.[FN14] *Millgard Corp. v. Cruz,* 99 Civ. 2952, 2003 U.S. Dist. LEXIS 20928, at *11 (S.D.N.Y. Nov. 18, 2003) ("courts may not by construction add or excise terms ... and thereby make a new contract for the parties under the guise of interpreting the writing.").

> FN14. It would be unfair for the Court now to interpret the Certificates to require notice of reserves increases as a condition precedent, when the Certificates did not clearly express such a requirement to Republic and to any other companies that have contracted with Folksamerica under similar language. While Republic certainly knew of its duty to provide notice, it did not, and should not have understood this requirement to be backed by such draconian consequences should it fail, even through no fault of its own, to comply. Clearly, a reinsurance contract that expressly provides for prompt notice as a condition precedent would be far less marketable to sophisticated players than the one utilized by Folksamerica, as under the former, ceding companies would be well-aware that the consequences of inadvertent late notice would be catastrophic. Folksamerica may not have it both ways.

Not only is Folksamerica's interpretation defied by basic tenets of contract law, but it also runs contrary to instructions contained within what appears to be a well-known treatise—one whose editor Folksamerica respects enough to quote.[FN15] According to that author, the following language should be utilized to achieve prompt notice as a condition precedent to recovery:

> FN15. Folksamerica block cites a passage contained within what it deems "a leading reinsurance text—Strain's, *Reinsurance,* (The College of Insurance, 1980). *See* Pl. Mem. at 22 (citing discussion of the intermediary's role).

As a condition precedent to recovery under this Contract, the Company shall advise the Reinsurer promptly (within 30 days of notice to Company) of all losses that may result in a claim under this Contract and of all subsequent developments thereto which may materially affect the position of the Reinsurer. The Company acknowledges that it is not necessary for the Reinsurer to establish prejudice resulting from any late notice of claim or loss and noncompliance by the Company with its obligations to notify the Reinsurer of any claim or loss, whether prejudicial or not, shall automatically relieve the Reinsurer of any liability with respect to that loss.[FN16]

> FN16. While this Court does not hold that language short of this exemplary clause will be insufficient to achieve a condition precedent, this clause helps to uncover the numerous inadequacies in Folksamerica's assertion that the notice provision in the Certificates is a condition precedent.

Robert W. Strain, *Reinsurance* 344 (Revised ed., Strain Publishing & Seminars, Inc.1996). Unlike the provision utilized by Folksamerica (which Strain explains is not to be construed as a condition precedent), the above provision (1) specifies to what the condition precedent refers, (2) sets out the number of days that suffice for prompt notice, (3) expressly states that the Reinsurer need not establish prejudice, and (4) clearly provides that the Reinsurer will be relieved of liability should prompt notice not be provided. A sophisticated corporation such as Mony Re would have, or at least should have, known how to make its notice provision a condition precedent, and indeed did so in the same Certificates, but either failed, or chose not to do so, with regard to this particular notice requirement.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

See, e.g. *In re Jacobowitz,* 296 B.R. 666, 672 (Bankr.S.D.N.Y.2003) ("business persons are generally held to a high level of accountability in record keeping"); *Talcott Natl. Corp. v. North St. Assocs.,* 77 Civ. 5859, 1979 U.S. Dist. LEXIS 9565, at *26 (S.D.N.Y. Sept. 26, 1979) (In the context of determining whether failure to disclose was material, court considered the conduct of defendants "in light of the fact that they were both sophisticated businessmen."). Therefore, this Court concludes as a matter of law that the provision requiring notice to the reinsurer when Republic raised its reserves over fifty percent, is not a condition precedent to Folksamerica's liability.

2. Prejudice Suffered From Failure to Provide Prompt Notice

**\*9** **[3]** Because the Certificates do not require prompt notice as a condition precedent, assuming that Republic violated the notice provision, in order to succeed on its claim for forfeiture under New York law, Folksamerica must prove that it suffered prejudice from the unreasonable delay in notice. New York law provides an escape hatch for *insurers* when policy holders do not strictly follow notice provisions proscribed in contracts; this is so even when such contracts do not require prompt notice as a condition precedent. See *Unigard Sec. Ins. Co., Inc.,* 79 N.Y.2d at 581, 584 N.Y.S.2d 290, 594 N.E.2d 571 ("It is settled New York law that the notice provision for a primary insurer operates as a condition precedent and that the insurer need not show prejudice to rely on the defense of late notice"), citing *Sec. Mut. Ins. Co. v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 440, 340 N.Y.S.2d 902, 293 N.E.2d 76 (1972). New York law however drastically limits the availability of this remedy in the *re-insurance* context – only offering such relief when the provision clearly and expressly requires notice as a condition precedent. See *Unigard Security Ins. Co., Inc.,* 4 F.3d at 1063 ("we certified to the New York Court of Appeals the following question: 'Must a reinsurer prove prejudice before it can successfully invoke the defense of late notice of loss by the reinsured?' The Court of Appeals answered

in the affirmative."); *Unigard Security Ins. Co., Inc.,* 79 N.Y.2d at 582, 584 N.Y.S.2d 290, 594 N.E.2d 571 ("There is nothing in this provision or elsewhere in the North River certificate indicating that the parties intended that the giving of notice should operate as a condition precedent"), comparing *Liberty Mut. Ins. Co. v. Gibbs,* 773 F.2d 15, 16–17 (1st Cir.1985) (certificate specifically provided that notice "is a condition precedent to any liability under this policy."). Such treatment makes complete sense as a result of the difference between the positions of the reinsurer and the primary insurer.

These differences in the contractual undertakings of reinsurers and primary insurers have consequences of critical importance, as courts in other jurisdictions have found. A reinsurer is not responsible for providing a defense, for investigating the claim or for attempting to get control of the claim in order to effect an early settlement. Unlike a primary insurer, it may not be held liable to the insured for a breach of these duties. Settlements, as well as the investigation and defense of claims are the sole responsibility of the primary insurer; and settlements made by the primary insurer are, by express terms of the reinsurance certificate, binding on the reinsurer. Thus, failure to give the required prompt notice is of substantially less significance for a reinsurer than for a primary insurer.

*Unigard Sec. Ins. Co., Inc.,* 79 N.Y.2d at 583, 584 N.Y.S.2d 290, 594 N.E.2d 571 (internal citations omitted) (emphasis added).

As discussed above, the notice provision in the Certificates does not require notice as a condition precedent, and therefore, if breached,[FN17] Folksamerica is required to prove prejudice in order to be relived from its reinsurance obligation. Any relevant prejudice as a result of late notice must take the form of *tangible economic* injury. The loss of the right to associate does not suffice. *Unigard Sec. Ins. Co., Inc.,* 4 F.3d at 1068–69.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

FN17. Because Folksamerica has not proven prejudice from Republic's alleged failure to provide prompt notice under the Certificates, it is unnecessary for this Court to determine, as a matter of law, whether Republic's notice was indeed late – the result under either answer is the same – Folksamerica is liable to Republic. If Republic provided prompt notice, Folksamerica is obviously tied to its obligation to remit payment. And, even if Republic grossly violated its notice obligations, because Folksamerica has not proven prejudice, Folksamerica must still indemnify Republic.

**\*10** Despite notice of the possibility that it would have to assert prejudice in order to be relieved from its obligations to Republic, as early as the interrogatory stage, when Republic expressly questioned Folksamerica with regard to the prejudice it suffered, FN18 and throughout the briefing of the three summary judgment motions that led up to this Opinion, Folksamerica has stood firm in its contention that it need not prove prejudice. Folksamerica has never even attempted to prove prejudice – its only submission with regard to prejudice was a declaration from its in-house counsel, that outlined potential prejudice claims, in order to substantiate its request to have an *additional opportunity* to prove prejudice should the Court deem it necessary. Haley Decl. ¶ 6. FN19

FN18. Portions of Republic's Interrogatories and Folksamerica's Responses, contained within Van Tol Decl. Ex. A., Haley Decl. ¶ 3, are excerpted herein. (*INTERROGATORY NO. 5.:* Do you contend that Folksamerica suffered any prejudice as a result of the lack of notice alleged in Paragraph 16 through 29 of the Complaint? If so, identify any such prejudice that Folksamerica alleges it suffered as a result of late note under the Thorpe Reinsurance Certificates; *RESPONSE TO INTERROG-*

*ATORY NO.5.:* Folksamerica objects to this interrogatory as requesting information not necessary or material to the issues present in this litigation and not likely to lead to the discovery of admissible evidence. Subject to and not waiving such objection, under New York law, as stated in this Circuit, prejudice is irrelevant because the certificates at issue require prompt notice by Republic as a condition precedent to payment, and for that reason Folksamerica has not contended that it suffered prejudice. *INTERROGATORY NO.11.:* Do you contend that Folksamerica suffered any prejudice as a result of the lack of notice alleged in Paragraphs 40 through 53 of the Complaint? If so, identify any such prejudice that Folksamerica alleges it suffered as a result of late notice under Clemtex Reinsurance Certificate; *RESPONSE TO INTERROGATORY NO.11.:* Folksamerica objects to this interrogatory as requesting information not necessary or material to the issues present in the litigation and not likely to lead to the discovery of admissible evidence. Subject to an[d] not waiving such objection, under New York law, as stated in this Circuit, prejudice is irrelevant because the certificates at issue require prompt notice by Republic as a condition precedent to payment, and for that reason Folksamerica has not contended that it suffered prejudice.)

FN19. Despite the fact that Folksamerica had ample opportunity to assert and substantiate a showing of prejudice, in the three summary judgment motions and was provided an additional chance at oral argument, this Court even invited, well-nigh pleaded with Folksamerica to discuss prejudice in a post argument letter brief. In this letter, instead of highlighting its proof of prejudice in its submissions before the Court, Folksamerica again reiterated its re-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

quest for yet another opportunity to prove prejudice. Folk. Post Argument Letter Brief ("Letter Brief") at 7. ("Folksamerica again requests the opportunity to prove prejudice if this court intends to hold that Folksamerica is required to prove prejudice. The paragraphs in the above referred to Haley Declaration that followed this request (paras.7–18) were not an attempt by Folksamerica to prove prejudice, as was apparent since they followed a request to be given the opportunity to prove prejudice, and rather were merely intended as a preliminary demonstration to show that the request had substance.").

This aside, the assertions of prejudice by Folksamerica have no basis in fact, and therefore, could not be substantiated by Folksamerica at trial. First, Folksamerica alleges that it suffered tangible economic harm from its inability to provide prompt notice to its retrocessionaires. Haley Decl. ¶ 12. However, Folksamerica fails even to allege (let alone substantiate) that any of its retrocessionaires have asserted late notice defenses themselves. Van Tol Decl. Ex. A, R at 105–09, 159–60, H at 127. FN20 Second, Folksamerica points to the fact that the late notice caused it to post late reserves, and led to its being under-reserved for a period of time, and consequently caused it to lose tax deductions. Haley Decl. ¶ 12. However, Folksamerica fails to show how its limited period of being under-reserved caused it to suffer any economic harm. Van Tol Decl. Exh. O at 165, S at 141–42, 44. When compared to Folksamerica's overall reserves, any additional missed reserves are inconsequential (Van Tol Decl. Exh. O at 172–73), and when coupled with the fact that Folksamerica posts reserves in the asbestos arena for losses that are incurred but not reported ("IBNR"), any shortfalls would have been covered. (R. Mem. at 22; Van Tol Decl. Ex. W at 29, X at 43–44, Q at 12). Folksamerica itself concedes that "this factor standing alone might be argued not to satisfy a need to show prejudice." Haley Decl. ¶ 8. Further, any missed deductions for

the Thorpe and Clemtex claims would only amount to about $1.5 million, hardly material when compared to the hundreds of millions that Folksamerica takes in loss deductions each year. R. Mem. at 23. And, Folksamerica also admits that it was never reprimanded or even contacted by any regulatory agency with regard to any reserve deficiencies. Van Tol Decl. Ex. W at 53. Folksamerica's third assertion, that it suffered prejudice because its relationship with Republic and Aon has been strained by this lawsuit, when it was Folksamerica that initiated the matter in the first place, is akin to the fellow who killed his parents and then pled for mercy because he was an orphan, and is too far-fetched to warrant further discussion. Lastly,FN21 Folksamerica's assertion, without further explanation, that it has suffered "premium issues" (Van Tol Decl. Exh. S at 141:23–24), if meant to refer to its inability to raise Republic's premiums upon renewal, lacks merit, as the Certificates were never renewed.

FN20. Folksamerica also asserts that if and when it submits payment to Republic, its retrocessionaires may refuse indemnification because they deem Folksamerica's payment to be in bad faith. Even prior to this Court's Opinion and Order, mandating payment to Republic, the retrocessionaires, in lieu of the "follow your fortunes" clause in all reinsurance contracts, would have likely been obligated to indemnify Folksamerica even if they disagreed with Folksamerica's failure to challenge the payment. *See Unigard Sec. Ins. Co., Inc., 79 N.Y.2d at 583, 584 N.Y.S.2d 290, 594 N.E.2d 571.* But, after this Opinion, any refusal on the part of Folksamerica's retrocessionaires to indemnify can most certainly be remedied by Court Order.

FN21. Additionally, Folksamerica's assertion that its lack of notice of claims against Thorpe and Clemtex caused it to pay an inflated price when it acquired Mony Re lacks merit as Folksamerica purchased

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

Mony Re in 1991, when Republic's reserves for Thorpe and Clemtex were only $1 and $180,000, respectively – and therefore had not yet triggered Republic's notice obligations.

**\*11** Perhaps Folksamerica gambled it would never have to prove prejudice—that it would prevail on both its contract interpretation arguments and on its choice of law assertion. While Folksamerica won the bet with regard to choice of law, it lost on its interpretation arguments. Had Folksamerica suffered actual prejudice in the form of tangible economic harm, it strains credulity to believe it would not have provided evidence of such prejudice, and instead sought an opportunity in the future to prove a material element of its claim. In lieu of Folksamerica's concession, and an unsurprising dearth of evidence of prejudice, this Court finds as a matter of law, that Folksamerica did not, and therefore could not, prove that it suffered prejudice from any alleged late notice on the part of Republic.

Folksamerica cites two cases in support of its position that it should be provided another opportunity to prove prejudice – both of which are inapposite. In *Christiania,* the Second Circuit held that the district court should have found that notice was due at an *earlier* date; therefore the reinsurer's concession that it did not suffer prejudice was no longer conclusive. *See Christiania Gen. Ins. Co., 979 F.2d 268, 278 (2d Cir.1992)* ("Although Christiania conceded it could demonstrate no prejudice as a result of the two-month delay from April to June 1987, it does not follow that if it is determined after a trial that Great American's duty to provide notice arose at some point in time before April 1987, Christiania would not be able to demonstrate prejudice by virtue of the longer delay."). In this case, Folksamerica asserts that it should have received notice as early as 1991, when claims were first filed against the underlying insureds. While this Court need not calculate exactly when notice was due, it is beyond question, that under this

Court's interpretation of the Certificates, notice was due long after 1991.[FN22] The fact that Folksamerica could not prove prejudice under its inflated interpretation supports the view that Folksamerica would most certainly be unable to prove prejudice under this Court's interpretation, which requires notice at a significantly later point in time. In the other case cited by Folksamerica, *Booking,* a case about late notice to the *primary* insurer, the Second Circuit reversed the district court's refusal to consider the choice of law issue, and determined that Texas law not New York law applied. Therefore, the Court remanded to provide the insurer with an opportunity to prove prejudice, as it was required to do under Texas law. *See Booking v.. General Star Mgmt. Co., 254 F.3d 414 (2d Cir.2001).* Because *Booking* involved insurance, where the law in New York is well-settled that whether or not a notice provision is a condition precedent, there is no obligation to prove prejudice, and the conflict of law question was not raised, the insurer had no duty to assert prejudice in the alternative. However, in this case, because it involves reinsurance, where even under New York law, prejudice must be shown if the provision is not a condition precedent, the status of the notice provision was directly at issue, and the conflict of law issue was raised and briefed extensively, Folksamerica was clearly "on notice" of the potential need to prove prejudice. Folksamerica has failed to provide any supportable ground to warrant yet another opportunity to prove prejudice. *See Fed.R.Civ.P. 1* (the federal rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."). Therefore, Folksamerica has neither proven prejudice nor provided sufficient grounds to warrant yet another attempt. Consequently, Folksamerica may not escape liability by virtue of late notice.

FN22. As a general matter, reserves of fifty percent translate to the establishment of reserves above $4 million for Thorpe and $2 million for Clemtex, on any claim or occurrence. Aon Letter Brief at 2–3. Republic raised its loss reserves to these

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

heights, at the earliest, in 2000 for Thorpe and 2002 for Clemtex. Rep. Letter Brief at 3–4.

3. Definitive Statement of Loss

**\*12** [4] Unlike the notice provision, it is undisputed that the DSOL provision requires submission of the DSOL as a condition precedent to Folksamerica's duty to remit payment. However, Folksamerica and Republic/Aon have a vastly different view as to how to classify the DSOL requirement, and, more importantly, as to *when* the DSOL provision requires submissions to be made. For purposes of clarity, I will quote the DSOL provision again:

C. As a condition precedent, the Company shall promptly provide the Reinsurer with a definitive statement of loss on any claim or occurrence reported to the Company and brought under the Certificate which involves a death, serious injury or lawsuit

Folksamerica asserts that the DSOL provision requires notice <sup>FN23</sup> of all claims and occurrences that involve death, serious injury, or a lawsuit, relevant to the coverage year of the reinsurance, regardless of whether the claims are significant enough to invoke Folksamerica's third-tier reinsurance.<sup>FN24</sup> Folk. Letter Brief at 1–2. In contrast, Republic and Aon assert that the DSOL is not required until an advanced stage when the claims have amounted to such significant losses, that the reinsurance is actually invoked, and the ceding company has billed the reinsurer. Rep. Letter Brief at 1; Aon Letter Brief at 1. Because the meaning presented by Republic and Aon, unlike the proposal by Folksamerica, renders all provisions of the Certificate sensible, this Court finds that such reading must, as a matter of law, apply.

FN23. Folksamerica cites to *Constitution Reins. Corp.,* 980 F.Supp. 124, as authority for its assertion that the DSOL provision, as a notice provision, obligated Republic to provide *notice* in the form of the DSOL of all claims that involved death, serious in-

jury or lawsuit, that pertained to the coverage years of its reinsurance. Although *Constitution Reinsurance* is indeed a case from this district that interprets similar Certificate language, there are several reasons why that Court's discussion of the DSOL provision under the heading of "Prompt Notice" is of little if any precedential value here. First, unlike this case where lawsuits trickled in over the course of several years, and did not until a later date amass the aggregate loss to trigger Folksamerica's liability, *Constitution Reinsurance* involved a scenario whereby one catastrophic event occurred, arguably triggering the ceding company's duty to provide notice and the duty to submit the DSOL. Second, the *Constitution Reinsurance* Court's interpretation of the DSOL provision as a notice requirement was universally accepted and endorsed by the parties, and therefore was never challenged in the district court proceeding. Third, while Stonewall did challenge the district court's interpretation of the DSOL provision on appeal, Constitution Reinsurance attacked this challenge as improper as Stonewall had failed to raise this argument below. While it is impossible to divine the rationale behind the Second Circuit's affirmance – as it was without opinion – it is likely that the Court did not consider arguments raised for the first time on appeal ( *see Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("a federal appellate court does not consider an issue not passed upon below.")) – and therefore there is no binding authority mandating a particular interpretation of the DSOL provision contained within the Certificates. Finally, and perhaps most importantly, as is discussed more fully *infra,* the Certificates at issue here contain an additional contractual requirement, not referenced by the *Constitution Reinsurance*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

Court, and therefore likely missing from the operative Certificate there, that makes the interpretation adopted by the *Constitution Reinsurance* Court inoperable here.

FN24. However, Larry Lande, an employee in Folksamerica's claims department, conceded at his deposition that a notice of loss and a DSOL are different, and that "the notice of loss necessarily does not contain all of the information that a definitive statement of loss will have." Lande Dep., 6/24/03 and 8/12/03, at 33; 13–22.

The DSOL comprises those materials that must be submitted to the reinsurer as a condition precedent to the reinsurer's duty to remit payment. Haley Decl. Exh. A ("DEFINITIVE STATEMENT OF LOSS Shall consist of those parts or portions of the Company's investigative claim file which in the Judgment of the Reinsurer are wholly sufficient for the Reinsurer to establish adequate loss reserves and determine the propensities of any loss reported hereunder."). By definition, "upon receipt of a definitive statement of loss, the Reinsurer shall promptly pay its proportion of such loss as set forth in the Declarations." Rep. Mem. at 20–21. Obviously, Folksamerica's interpretation of the DSOL as a notice provision,FN25 that requires substantiation of all claims and occurrences involving the reinsurance year makes the DSOL, as defined by the Certificate, inoperable. Under Folksamerica's interpretation, Republic was obligated to provide Folksamerica with prompt notice of all claims and occurrences, involving coverage years, substantiated by detailed reports from the claims files, *even if the claims or occurrences did not trigger the reinsurance,* and upon receiving the DSOL, Folksamerica would be bound promptly to remit payment to Republic, despite the fact that no payment is actually due under the Certificates. As a result of the interplay between the receipt of the DSOL and the duty to submit the reinsurance payment, the DSOL provision must, in order to have practical effect, be triggered at a later date than (or, in the case of cata-

strophic claims, simultaneously with) the notice provision. *See Goodheart Clothing Co. v. Laura Goodman Enters., Inc.,* 962 F.2d 268, 272 (2d Cir.1992) ("a court should interpret a contract in a way that ascribes meaning, if possible, to all of its terms.") (citations omitted); Restatement Second of Contracts § 203(a) (1981) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"). The only viable reading of the DSOL mandates that it be read to require a detailed billing, promptly after submission of a summary invoice, as a condition precedent to Folksamerica's duty to remit its reinsurance payment. Folksamerica's attempt to transform the DSOL provision into a second notice provision is simply unworkable.

FN25. It is clear that Folksamerica would have preferred to have had a notice provision tied to claims or occurrences, not to the raising of reserves. The following provision, would have better achieved Folksamerica's wishes: "The Company shall advise the Reinsurer promptly of all losses which, in the opinion of the Company, may result in a claim under this Contract and of all subsequent developments thereto which may affect the position of the Reinsurer." Richard M. Shaw, "Casualty Excess of Loss," in Robert W. Strain, ed., *Reinsurance Contract Wording* 345 (Revised ed.1996). However, as is conceded by Lande, the Certificates do not contain such a provision. Lande Dep. 6/24/03, 8/12/03, at 214:10–17 (Lande conceded that the Certificates did not require notice of a claim or occurrence at the time the claim or occurrence was brought or was made known to Republic).

**\*13** Because the DSOL provision, unlike the relevant notice provision, is drafted as a condition precedent, if violated by Republic, Folksamerica need not prove prejudice in order to avoid its rein-

Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)
**(Cite as: 2003 WL 22852737 (S.D.N.Y.))**

surance obligation. *See Unigard Security Ins. Co., Inc.,* 4 F.3d at 1063. Therefore, in order to determine whether Republic violated the DSOL requirement, it is necessary to discern when Republic first acquired the duty to submit the DSOL.[FN26] Although the parties do not specifically address the function of the word "promptly" in this context, this Court finds, by way of analogy to requirements of prompt notice, that the mandate of "prompt" submission limits the amount of allowable time between the ceding company's bill submission and its transmittal of the DSOL, to that of a reasonable time. *See, e.g., Christiania Gen. Ins. Co.,* 979 F.2d at 275. "New York courts have held that the question whether notice was given within a reasonable time may be determined as a question of law when (1) the facts bearing on the delay in providing notice are not in dispute and (2) the insured has not offered a valid excuse for the delay." *Constitution Reinsur. Corp.,* 980 F.Supp. at 130, citing *State of New York v. Blank,* 27 F.3d 783, 797 (2d Cir.1994). In the notice context at least, "it is only when no excuse is offered for delay, or when no credible evidence supports the proffered excuse, that notice will be held untimely as a matter of law." *Hartford Fire Ins. Co. v. Masternak,* 55 A.D.2d 472, 390 N.Y.S.2d 949, 952 (4th Dep't 1977).

> FN26. It should be noted that had the provision not included the word "promptly," I would have determined that there was no date upon which Republic's duty to provide Folksamerica with the DSOL attached. Rather, any delay would just cause a similar delay in Republic's receipt of payment. However, because the provision includes the word "promptly," there is a requirement that the DSOL be submitted within a reasonable time after the bill has been issued.

Because, at the time this action commenced, Republic had not yet billed Folksamerica under Clemtex, Republic's obligation to provide the DSOL had not yet arisen. Therefore, despite the fact that the parties dispute when the DSOL was provided (Folksamerica claims submission was made in November 2002 (Folk. Letter Brief at 5), Republic and Aon assert submission in July 2002 (Rep. Letter Brief at 2; Aon Letter Brief at 2)), as this submission was premature, this Court finds as a matter of law, that Republic did not violate the DSOL provision as per its obligations under Clemtex.

[5] On the other hand, it is undisputed that, at the time Folksamerica filed this action, Republic had already billed Folksamerica under Thorpe. Republic asserts that it sent initial bills to Folksamerica in March, April, and May 2002 (Rep. Letter Brief at 1); Aon states that Republic first billed Folksamerica in May 2002 (Aon Letter Brief at 1). Folksamerica asserts that Republic sent invoices in April 2002. Folk. Letter Brief at 5. While this factual dispute is not extensive, the parties are in greater disagreement over when the DSOL was submitted. Folksamerica asserts that the DSOL was never voluntarily provided, and was only made available during an audit in November 2002. Id. at 5, 390 N.Y.S.2d 949. Republic asserts that on May 3, 2002, it sent the DSOL, consisting of various reports and information, to Larry Lande of Folksamerica[FN27] (Rep. Letter Brief at 2), and Aon claims that Republic submitted the DSOL as early as April 2, 2002 (Aon Letter Brief at 1). The parties' varying assertions suggest that anywhere from no delay to an eight month delay in submission of the DSOL under Thorpe may have occurred. Therefore, the determination of (1) the length of Republic's delay, if any, in its submission of the DSOL for the Thorpe Certificates, and (2) whether such delay, if any, was reasonable,[FN28] involve material issues of fact, and may not be resolved on a motion for summary judgment.

> FN27. It should be noted that Republic asserts as an excuse for any delay in submitting a DSOL, that it had been promptly submitting reports and files to Aon, who, because of a computer glitch, did not prop-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

erly and promptly forward such documents to Folksamerica. The determination of whether this excuse is valid, along with the determination of whether the DSOL was indeed late, entails analysis of Aon's role as the agent of Folksamerica or Republic. Because it may first be determined that whatever delay (if any) in submission of the DSOL to Folksamerica was not unreasonable, whereby obviating the need to conduct these inquiries, this Court deems it premature to undergo an analysis and determination of such issues at this time.

FN28. Republic asserts that because Folksamerica had notice of the Thorpe claims, and indeed had detailed reports regarding Thorpe, from its receipt of such documentation with regard to its separate treaty reinsurance policy, GLARC, for Thorpe. Folksamerica had constructive notice of the Thorpe claims, and therefore cannot assert any late notice defenses. If it is later determined that Republic's delay, if any, in submitting the DSOL under Thorpe was unreasonable, Republic may then raise this claim of constructive notice. Because the need to resolve this issue may never arise, it would be improper for the Court now to resolve this contingent issue.

### III. CONCLUSION

**\*14** For the foregoing reasons, (1) Republic's motion for summary judgment is granted-in-part and denied-in-part, (2) Folksamerica's motion for summary judgment is denied, and (3) Aon's motion for summary judgment is denied. Republic's motion to strike portions of several of Folksamerica's Declarations in addition to its Rule 56.1 Statement and for sanctions for alleged violations of Fed.R.Civ.P. 36(b) is denied. This Court finds as a matter of law that Republic's violations of any notice provisions contained within the Certificates do not relieve Folksamerica of its obligation to indemnify Republic. Further, this Court concludes as a matter of law

that with regard to Clemtex, Republic did not violate the DSOL provision. However, summary judgment on the following issues of fact, with regard to the Thorpe Certificates, is inappropriate: (a) whether Republic violated the DSOL provision in the Thorpe Certificates, due to untimely submission, (b) whether the untimeliness, if any, of Republic's submission of the DSOL under Thorpe was unreasonable, and (c) whether, if such violations are deemed unreasonable, Republic's proffered excuse that Aon is the party at fault or that Folksamerica had constructive notice as a result of GLARC, or any other defense, will be credited. The trial will commence on December 8, 2003. In anticipation of the trial, all voir dire, requests, and any in limine motions must be fully submitted by December 1, 2003, as explained in my scheduling notice of November 6, 2003. The Clerk of the Court is ordered to close all pending motions. Any request to adjourn the trial will be entertained in a teleconference to chambers today, November 25, 2003, or Monday December 1, 2003.

IT IS SO ORDERED.

S.D.N.Y.,2003.
Folksamerica Reinsurance Co. v. Republic Ins. Co.
Not Reported in F.Supp.2d, 2003 WL 22852737 (S.D.N.Y.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

C

United States District Court, S.D. New York.
UNITED STATES SMALL BUSINESS ADMINIS-
TRATION, as an agency of the United States of Amer-
ica, in its capacity as receiver for Diamond Capital
Corp., Plaintiff,
v.
CITIBANK, N.A., Republic National Bank of New
York and Bank of Tokyo Trust Company, Defendants.

No. 94 Civ. 4259 (PKL).

Feb. 4, 1997.

Morley & Trager, New York City (Leslie Trager, Esq.,
of counsel), for Plaintiff.

Sills Cummis Zuckerman Radin Tischman Epstein &
Gross, P.A., New York City, (Joseph L. Buckley, Esq.,
of counsel, Adam J. Kaiser, Esq., of counsel,) for De-
fendant Citibank, N.A.

Law Offices of Andrew S. O'Connor New York City (
Andrew S. O'Connor, Esq., of counsel), for Defendant
Republic National Bank of New York.

Davis, Scott, Weber & Edwards, P.C., New York City (
George F. Hritz, Esq., of counsel, Mark J. Schirmer,
Esq., of counsel, for Defendant Bank of Tokyo Trust
Company.

ORDER AND OPINION

LEISURE, District Judge:

**\*1** The above-captioned action is a case under New
York's Uniform Commercial Code (the "NYUCC" or
the "Code") and common law principles of commer-
cially reasonable practice. Plaintiff United States Small
Business Administration ("SBA") alleges that these
checks were honored and deposited -- Bank of Tokyo
Trust Company ("BOTT"), Republic National Bank of
New York ("RNB"), and Citibank, N.A. ("Citibank") --
in contravention of the endorsement instructions by de-
fendant banks. Before the Court are defendants' motions
to dismiss plaintiff's common law claim for payment of

an instrument on a forged endorsement; defendants' mo-
tions for summary judgment, under Rule 56(b) of the
Federal Rules for Civil Procedure, as to the other
claims; plaintiff's cross-motion for summary judgment,
under Rule 56(a); and defendants Citibank's and
BOTT's motions to strike all or portions of the affi-
davits submitted by counsel for plaintiff in connection
with the herein motions, or in the alternative to impose
discovery sanctions. For the reasons stated below, the
motion to dismiss is granted, all of the motions for sum-
mary judgment are granted in part and denied in part,
and the motions to strike are granted in part and denied
in part.

BACKGROUND

The relevant, undisputed facts are as follows. Dia-
mond Capital Corporation ("DCC") was a Small Busi-
ness Investment Corporation ("SBIC") licensed by the
SBA. In early 1991, Charles Starace bought shares of
DCC from a number of individuals, including some of
the officers of the corporation. At around the same time,
Mr. Starace entered into a consulting agreement (the
"Agreement"), signed by DCC's officers and principals,
purporting to confer on Mr. Starace the power to run the
day to day operations of DCC, including control of
cash-flow and the authority to endorse checks made
payable to DCC.

Also in early 1991, a bank account was opened at
BOTT under the name International Diamond Capital
Corporation ("IDCC"),[FN1] and another account was
opened at Citibank under the name ABR Management,
Inc. ("ABR").[FN2] Between March and December of
1991, Mr. Starace or his representatives deposited sev-
enteen checks -- fifteen at BOTT and two at Citibank --
each made payable to the order of DCC, in these ac-
counts.[FN3] All of the checks but one were endorsed to
the IDCC or ABR account by Mr. Starace or under his
authority,[FN4] and the proceeds of each check were
credited to the account named in the endorsement on the
back of the check rather than to the payee named on the
front, DCC. One of the checks was not endorsed by Mr.
Starace, but was presented to Citibank and was en-
dorsed by it on his behalf.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

**FN1.** Plaintiff alleged in its complaint that the account was opened under the name International Diamond Capital Corporation, but now in its briefs refers to "International Diamond Corporation." *See, e.g.,* Pl.'s Mem. Opp. Mot. & Supp. Pl.'s Cross-Mot. at 7. The Court must assume that this inconsistency is the result of plaintiff's oversight.

**FN2.** There is dispute as to the exact name of the account. The account name appearing on the signature card prepared when the account was established lists "ABR Management, Inc. A/A/F Diamond Capital Corp." *See* Trager Reply Aff. Supp. Cross-Mot. Ex. B. Plaintiff contends that the name was only "ABR Management, Inc.," and presents three other documents relating to the establishment of the account, on which the words "A/A/F Diamond Capital Corp." are absent. *See id.*

**FN3.** The checks were made by payors and drawn on banks not parties to this litigation.

**FN4.** Defendants' Rule 3(g) statements asserted that it was undisputed that the checks "were endorsed by or under the authority of Mr. Starace." Def. BOTT's Rule 3(g) Statement ¶ 2; Def. Citibank's Rule 3(g) Statement ¶ 2. Plaintiff responds: "Denied. See answer 1. above." *See* Pl.'s Resp. to Def. BOTT's 3(g) Statement ¶ 2; Pl.'s Resp. to Def. Citibank's 3(g) Statement ¶ 2. The paragraph referred to relates to plaintiff's position regarding Mr. Starace's actual authority to operate DCC, including his authority to endorse checks for "unlawful" deposit. It is apparent from plaintiff's arguments that it does not dispute that the endorsements were added by Mr. Starace or under his authority (to the extent that he had any authority). Thus, plaintiff's statement can only sensibly be read in context as disputing not that Mr. Starace in fact endorsed the checks, but his authority to do so.

In early 1992, an account was opened at RNB, also under the name International Diamond Corporation. Between February and November of 1992, six checks, payable to the order of DCC and endorsed on the back with RNB's IDCC account number, were deposited by Starace or his representatives. The proceeds of the checks were credited to RNB's IDCC account. Some time in July of 1992, a second account, under the name Starace Equities ("Starace") was opened at RNB. In August of 1992, one check, made payable to DCC and endorsed on the back with the Starace account number, was deposited, and the proceeds were credited to the Starace account.

**\*2** Plaintiff asserts three claims against each bank. First, it claims that the banks failed to act in a commercially reasonable manner when they credited the proceeds of the checks into accounts other than an account belonging to the payee, DCC, named on the front of the checks. Second, plaintiff claims that the banks violated section 3-206(3) of the NYUCC by failing to deposit the funds in a manner consistent with restrictive endorsements on the backs of the checks. Third, plaintiff claims that the banks converted the checks in violation of section 3-419(1)(c) of the NYUCC by paying the checks on a forged endorsement.

### DISCUSSION

Because the Court must consider the valid affidavits and other documentary evidence submitted in connection with the instant motions and cross-motion for summary judgment, the motions to strike several of the affidavits must be considered first. This opinion will then address the merits of the case. The standards for determination of a motion for summary judgment are familiar and need not be elaborated at great length. To grant summary judgment, the Court must find that no genuine issues of material fact remain and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. Proc. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that no genuine issue of fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *LaFond v. General Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir. 1995).

A court's function in evaluating a summary judg-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

ment motion is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir. 1994). In assessing the record to determine whether there is a genuine issue as to any material fact, the nonmovant's evidence is to be believed, and all reasonable inferences are to be drawn in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *LaFond,* 165 F.3d at 171. However, "[t]he non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990) (internal quotation marks and citations omitted).

I. *Motions to Strike and for Discovery Sanctions*

Defendants move to strike, in whole or in part, the affidavit of Leslie Trager, Esq., plaintiff's counsel, submitted in support of plaintiff's cross-motion for judgment on the pleadings and in opposition the motions for summary judgment (the "first affidavit"). Defendants move in the alternative for sanctions, on the basis that if the factual assertions set forth in the first affidavit are made on the basis of Mr. Trager's personal knowledge, then Mr. Trager is a material witness and his identity as such should have been disclosed to defendants as a person designated to testify to matters known to a party organization, under Rule 30(b)(6) of the Federal Rules of Civil Procedure. Finally, defendants move jointly to strike the affidavit submitted in opposition to the motion to strike (the "second affidavit"); and to strike the affidavit submitted in connection with plaintiff's reply in support of its cross-motion. Because the Court, as discussed below, will grant the motions to strike, the motion for sanctions is denied.

**\*3** Defendants move on the ground that Mr. Trager has failed to comply with Rule 56(e) of the Federal Rules of Civil Procedure, which sets out the form of affidavits to be considered by a court in connection with motions under Rule 56. The rule states, in relevant part, that "[s]upporting and opposing affidavits shall be made on *personal knowledge,* shall set forth such facts as would be *admissible in evidence,* and shall show affirmatively that the *affiant is competent to testify* to the matters stated therein." Fed. R. Civ. Proc. 56(e) (emphasis added). It is well-settled that any part of an affidavit which does not contain specific facts of which the affiant has first-hand knowledge is not entitled to any weight and cannot be considered by the court. *See, e.g. Union Ins. Soc'y v. William Gluckin & Co.,* 353 F.2d 946, 952 (2d Cir. 1965). Portions of an affidavit stating ultimate facts or legal conclusions must also be disregarded. *See Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir. 1986) (holding that district court erred in declining to strike conclusory "crucial statement" in an affidavit); *A.L. Pickens Co. v. Youngstown Sheet & Tube Co.,* 650 F.2d 118, 121 (6th Cir. 1981) (striking statements as to legal conclusions from an affidavit). The Court has closely examined the affidavits at issue, and finds that the first and third affidavits must be stricken in part or in whole.

The first affidavit is comprised of (1) legal conclusions; (2) factual conjecture, speculation, and assertions of which Mr. Trager can demonstrate no personal, first-hand knowledge and/or to which Mr. Trager lacks competence to testify; (3) hearsay; and (4) documents attached as exhibits. The first affidavit, with the exception of the attached exhibits, is therefore largely useless in terms of setting forth facts necessary for the determination of the herein motions. Mr. Trager's second affidavit attempts to justify his first affidavit on the ground that "the Court is entitled to know what the true facts are." Trager Aff. Opp. Mot. Strike ¶ 5 [hereinafter Trager's Second Aff.]. Mr. Trager's audacious pronouncement entirely misses the point, which is that the first affidavit does not allow the Court "to know what the true facts are," because it is composed of (1) legal conclusions rather than factual assertions; (2) factual assertions that are unreliable in a summary judgment motion due to the fact that the affiant could not have personal knowledge of them and/or would not be competent to testify regarding them; and (3) inadmissible hearsay.

Mr. Trager's assurance, in his second affidavit, that certain unnamed witnesses with first-hand knowledge will be able to testify at trial as to the assertions set

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

forth in the first affidavit, does nothing to change the outcome. *See* Trager's Second Aff. ¶ 5. If the issues addressed in the first affidavit were to go to trial, then the admissible testimony of competent witnesses would be heard and considered. However, on this motion for summary judgment, the inadmissible statements of a person not competent to testify cannot, according to Rule 56, be considered. *See* Fed. R. Civ. Proc. 56(e); *Tamarin v. Adam Caterers Inc.,* 13 F.3d 51, 53 (2d Cir. 1993). Finally, Mr. Trager airily and vaguely asserts in his second affidavit that his knowledge of "*many* of these facts and what happened is first hand *or close to it.*" *Id.* (emphasis added). Plaintiff's attempt to salvage the first affidavit with this conclusory and non-specific statement is facially inadequate. Mr. Trager makes no attempt to specify which assertions are based on firsthand knowledge or how he obtained such knowledge. Because plaintiff has provided the Court no way of determining which portions of the first affidavit are based on personal knowledge, the Court has no choice but to strike all of the statements. *See Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir. 1988). However, the exhibits attached to the affidavit appear to be accepted by defendants as true copies of authentic documents and do not appear to fall afoul of the Rule 56(e) requirements. *See H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454-55 (2d Cir. 1991). Accordingly, the first affidavit, except for the exhibits, is stricken for failure to comply with Rule 56(e).

**\*4** The second affidavit is comprised of (1) legal argument and factual assertions regarding the motion to strike the first affidavit; and (2) legal argument and factual assertions apparently intended to address the question of discovery sanctions. The statements falling into the first category have been rejected by the Court, and those in the second category are moot. Furthermore, the affidavit is completely irrelevant to the summary judgment motions and need not be considered in the determination of the merits. Nevertheless, the affidavit should not be stricken pursuant to the requirements of Rule 56(e), because they only apply to affidavits made in support of or opposition to a motion under Rule 56. Therefore, the second affidavit need not be stricken.

Finally, the third affidavit can be described in the same terms applied above to the first affidavit. Most of the affidavit must be stricken for the reasons adverted to above. In this affidavit, however, there is one paragraph which appears to address factual matters of which Mr. Trager has personal knowledge. Paragraph 5 purports to present evidence as to Citibank's rules regarding double-endorsed checks, and recounts an anecdote involving an attempt Mr. Trager made at some unspecified time to cash or deposit such a check where the endorser was a corporation that was not a Citibank customer. He alleges that he was told that Citibank's rules prohibited acceptance of such checks.[FN5] The rest of the paragraph wanders into Mr. Trager's conjecture as to the reasons that Citibank might have such a rule and how such a rule would apply if the endorsing corporation were a Citibank customer. This latter portion of the paragraph constitutes sheer speculation and must be stricken. The third affidavit, like the first affidavit, includes exhibits, the authenticity of which defendants do not apparently challenge. The third affidavit, except the exhibits and the first five sentences of the fifth paragraph, is stricken.

> [FN5.] Mr. Trager's statements about what he was told by a Citibank employee appear to qualify as a non-hearsay admission by a party opponent, and thus is not barred by Rule 56(e)'s requirement of admissibility. *See* Fed. R. Evid. 801(d)(2).

II. *Common Law Claim and Displacement Under the NYUCC*

The NYUCC displaces certain common law causes of action. However, "[u]nless displaced by the particular provisions of this Act, the principles of law and equity ... shall supplement its provisions." N.Y. U.C.C. § 1-103 (McKinney 1993). Further, general principles of statutory construction indicate that specific, clear legislative intent is required in order to displace existing common law. *See, e.g., Hechter v. New York Life Ins. Co.,* 46 N.Y.S.2d 34, 39, 412 N.Y.S.2d 812, 815, 385 N.E.2d 551, 554 (1978). Here, plaintiff states a common law cause of action on the basis of the same underlying facts as those alleged in support of its claims under

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

Code section 3-419(1)(c), which holds a bank liable for payment of an instrument on a forged endorsement. Plaintiff's common law cause of action sounds in negligence, alleging that defendants acted in a commercially unreasonable manner in negotiating the checks because they were endorsed by one lacking authority to endorse on the payee's behalf.

**\*5** Thus, the issue is whether plaintiff's common law negligence claims are displaced by section 3-419 of the NYUCC. The New York Court of Appeals held in *Hechter* that a common law cause of action sounding in contract was not displaced by the statute. *See id.* In so holding, the court stated that the language in section 3-419(3), which states that a representative "is not liable in conversion or otherwise" under certain circumstances, "*suggests* that all pre-code actions regardless of form are to continue." *Id.* (emphasis added). Thus, *Hechter* arguably stands for the proposition that *any* common law cause of action, not just a contract cause of action, can still be validly asserted for a depositary bank's payment on a forged endorsement.

With regard to the specific question of the survival of a cause of action sounding in negligence, however, the holding in *Hechter* does not readily apply. The Code section itself states an exception to liability for "a representative, including a depositary or collecting bank" who acts "in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative." N.Y. U.C.C. § 3-419(3) (McKinney 1991). It appears that the legislature, in enacting the Code, intended that a bank's only defense, once a forged endorsement is proved, be proof of good faith and commercial reasonability. The statute does not contemplate a defense of comparative negligence, which typically would apply against a common law claim. Thus, plaintiff's claim that defendants failed to act in a commercially reasonable manner appears to be displaced by or subsumed in section 3-419. *See Hartford Fire Ins. Co. v. Cavallo,* No. 125640/94-001, slip op. at 3 (N.Y. Sup. Ct. June 28, 1995); *accord, e.g., Equitable Life Assurance Soc'y v. Okey,* 812 F.2d 906, 910 (4th Cir. 1987). Therefore, plaintiff cannot state an independent common law claim for commercially un-

reasonable practice as to the allegedly forged endorsement.

III. *Claims for Violation of Restrictive Endorsements*

An endorsement on an instrument like a check is a writing, appearing usually on the back of the instrument, whereby the instrument is negotiated to another party. *See* N.Y. U.C.C. §§ 3-201, 3-202 (McKinney 1991). An endorsement can be in blank, special, or restrictive. An endorsement in blank is simply the signature of the transferor, and an instrument so endorsed becomes a bearer instrument, payable upon delivery unless further endorsed. *See id.* § 3-204(2). A special endorsement is one negotiating an instrument to the transferee named in the endorsement; a restrictive endorsement is one that includes words directing that the instrument be dealt with only in a specific manner, one of the most common examples being "for deposit only." *See id.* §§ 3-204(1), 3-205 (defining, respectively, special and restrictive endorsements). A restrictive endorsement does not prevent further transfer of the instrument, but one that includes the words "for deposit" (as do the endorsements involved in this case) has the effect of requiring a further transferee, such as the depositary banks named as defendants here, to pay or apply the value of the instrument "consistently with the indorsement." *Id.* § 3-206(1), (3). A depositary bank can be held liable under section 3-206(3) for failing to apply funds in a manner consistent with a restrictive endorsement.

A. *Checks Deposited at BOTT*

**\*6** Between July and December of 1991, thirteen checks payable to the order of DCC, for a total of $443,832.36, were deposited into the BOTT account numbered 620200855. This account had been opened under the name "International Diamond Capital Corp." Plaintiff claims that BOTT is liable under section 3-206(3) of the NYUCC because it deposited the checks, in violation of restrictive endorsements on each check, into the IDCC account. Plaintiff also claims that BOTT failed to act in a commercially reasonable manner in doing so.

The checks can be grouped into three categories according to the endorsements placed on each. The eight

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6
Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

checks comprising the first group, totaling $256,076.25, were endorsed as follows: "for deposit only/ 620200855/Diamond Capital." *See* Trager Aff. Supp. Cross-Mot. & Opp. Defs.' Mots. Ex. D. The two checks in the second group, totaling $113,420.31, were endorsed as follows: "for deposit only/Diamond Capital/ 620200855." *See* Trager Aff. Supp. Cross-Mot. & Opp. Defs.' Mots. Ex. A. The five checks in the third group, totaling $74,335.80, were endorsed substantially as follows: "for deposit only/620200855." [FN6] *See* Trager Aff. Supp. Cross-Mot. & Opp. Defs.' Mots. Ex. C. The entirety of each endorsement on each check is written in the same handwriting.

> [FN6]. Three of the five checks bore the following endorsement: "for deposit only/ 620200855/International Diamond Capital." However, all five checks can be analyzed as a group in that all lack an endorsement in the name of the payee, Diamond Capital Corporation.

Plaintiff cannot prevail on its claim that defendant failed to comply with the restrictive endorsements given on the checks in the first group. The endorsement directs the depositary bank to deposit the funds only in the account numbered 62020085 (that belonging to IDCC), and is signed in the name of the payee named on the front of the check.[FN7] The single endorsement functions both as a special endorsement transferring the check to IDCC and as a restrictive endorsement making the check good only for deposit to that account. *See Spielman v. Manufacturers Hanover Trust Co.,* 60 N.Y.2d 221, 226-27, 469 N.Y.S.2d 69, 71-72, 456 N.E.2d 1192, 1194-95 (1983).* BOTT followed the payee's (DCC's) unambiguous instructions by depositing the funds into IDCC's account. Accordingly, no finder of fact could rationally conclude that there was a violation of Code section 3-206 or that BOTT acted in a commercially unreasonable manner. *See Federal Ins. Co. v. Manufacturers Hanover Trust Co.,* 157 A.D.2d 460, 460, 549 N.Y.S.2d 385, 386 (1990) ( "Having followed the express language of the endorsements, defendant cannot be held liable, and this is so even though the endorsements directed that the money be deposited

into an account held by someone other than the endorsing party." (citing *Spielman*)).

> [FN7]. The fact that the transferee, IDCC, is only identified by its account number does not change this analysis, because, as the New York Court of Appeals has observed, "[t]hat the account number was used rather than the name of the owner of the account does not alter the designation when the account is in existence and identifiable as belonging to a specific person." *Spielman v. Manufacturers Hanover Trust Co.,* 60 N.Y.2d 221, 227, 469 N.Y.S.2d 69, 72, 456 N.E.2d 1192, 1195 (1983); *cf.* N.Y. U.C.C. § 3-401(2) (McKinney 1991) (including in the definition of signature "any word or mark used in lieu of a written signature.").

The endorsements on the checks in the second group are analytically similar, only differing in the order of the words. Plaintiff urges a strained construction of this endorsement, interpreting the first two lines as directing that the funds be deposited only in DCC's account, and reads the last line as surplusage. Plaintiff would carry the burden of proof at trial, and thus must point evidence to show that such an interpretation is possible. *See Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir. 1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."). Here, plaintiff puts forward no evidence to show that the endorsement was not written by a single person and in a single writing. Indeed, the fact that on each check all three lines of the endorsement are written in the same handwriting supports this interpretation. Thus, the endorsement can only rationally be read as a single endorsement, directing that the check be accepted for deposit, signed in the name of the payee named on the front of the check (DCC), and directing the deposit into the IDCC account. As it did with the checks in the first group, BOTT deposited the funds as directed, and summary judgment for defendant is therefore appropriate.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

**\*7** The checks in the third group, in contrast, bore endorsements that did not contain the name of the payee indicated on the front of the check, DCC. Thus, although it is undisputed that the checks were presented and endorsed by Mr. Starace or under his authority, neither he nor anyone else actually signed the checks *on DCC's behalf.* As to these checks, defendant did not violate Code section 3-206(3) because it followed the letter of the restrictive endorsement on the checks by depositing the funds in the named account. The only legal question presented by these facts is whether BOTT should have allowed IDCC to negotiate the checks by depositing them into its account, absent an endorsement from DCC negotiating the checks to IDCC.[FN8] Accordingly, defendant's motion for summary judgment is also granted as to plaintiff's claims that BOTT failed to follow a restrictive endorsement on the checks in this third category.

FN8. This question is addressed below in Part IV.B.

B. *Checks Deposited at Citibank*
In March and April of 1991, two checks payable to the order of DCC, for a total of $162,684.93, were deposited into the Citibank account numbered 35377334, the ABR account. The first check, for $80,000, was not endorsed in writing but had an endorsement added by Citibank. The second check, for $82,684.93 was endorsed as follows: Diamond Capital Corp./Deposit Only/35377334. The first line of the endorsement appears next to an "x" apparently imprinted on the back of the check. Plaintiff asserts that depositing checks endorsed in this manner into an account not belonging to the payee named on the front was inconsistent with a restrictive endorsement and thus constituted a violation of section 3-206(3) and a failure to act in a commercially reasonable manner.

The first check was only endorsed by Citibank with the words "Credit to the Account/of the Within Named Payee/Absence of Endorsement Guaranteed/CITIBANK, N.A./[branch address]/A/C # 35377334." The funds were deposited into the account indicated by the number, the ABR account. Such an endorsement, commonly known as a "PEG" endorsement, can be supplied

by a bank on behalf of its customer. *See* N.Y. U.C.C. § 4-205(1). The party whose endorsement is supplied need not hold an account at the bank, given that the statute speaks uses the term "customer," which includes "any person ... for whom a bank has agreed to collect items." N.Y. U.C.C. § 4-104. Once a bank has supplied such an endorsement, it is bound by its own restrictive endorsement on the customer's behalf. *See Marine Midland Bank, N.A. v. Price, Miller, Evans & Flowers,* 57 N.Y.2d 220, 227, 455 N.Y.S.2d 565, 569, 441 N.E.2d 1083, 1087 (1982) ("[The] contention that subdivision (3) of section 3-206 does not apply to a depositary bank which has supplied a restrictive indorsement on its customer's behalf pursuant to subdivision (1) of section 4-205, finds no support in either statute.").

As to both the question whether DCC was Citibank's customer and the question whether the funds can be deemed to have been deposited in an account for DCC, factual issues remain, precluding summary judgment in either party's favor. Mr. Starace, in deposition testimony, stated that the ABR account was maintained for DCC's benefit. The arrangement was necessary, according to Mr. Starace, because other banks would not accept DCC's checks due to the high volume of checks returned for insufficiency of funds. Dep. Tr. at 40-43, 46, *In re Diamond Capital Corporation* (Bankr. S.D.N.Y. Jan. 22, 1993), attached as Kaiser Aff. Ex. J. Indeed, the title of the account appearing on the signature card is "ABR Management, Inc. A/A/F Diamond Capital Corp."[FN9] *See* Trager Reply Aff. Supp. Cross-Mot. Ex. B. Thus, defendant contends, DCC was Citibank's customer in that Citibank, by opening the account, in effect agreed to collect items on behalf of DCC. *See* N.Y. U.C.C. § 4-104. Furthermore, Citibank contends, depositing the funds in an account maintained by the agent of DCC for DCC's benefit satisfied the restrictive endorsement that the funds were credited to the named payee's (DCC's) account.

FN9. "A/A/F" commonly stands for "as agent for."

**\*8** Plaintiff, however, raises sufficient questions about the validity of ABR's agency status to defeat defendant's motion for summary judgment as to the first

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

Page 8

check. First, plaintiff points to apparent inconsistencies in Mr. Starace's deposition testimony, suggesting that his testimony that the ABR account was maintained for the benefit of DCC might not be reliable. Second, plaintiff presents documents relating to the opening of the account, on which the name "ABR Management, Inc." alone appears. Thus, plaintiff at least raises an issue of credibility, which precludes summary judgment in favor of either party. *See, e.g., Lendino v. Trans Union Credit Info. Co.,* 970 F.2d 1110, 1113 (2d Cir. 1992).

The endorsement appearing on the second check is a much simpler matter, as it is analytically similar to the endorsements on the first and second groups of checks, discussed above, that were deposited at BOTT. Only the order of the items is rearranged, with DCC's signature appearing on the first line and the instruction and transferee appearing on the second and third lines respectively. Plaintiff again urges that the first two lines should be read together as a restrictive endorsement directing deposit only in an account belonging to DCC, and the last line as surplusage. As with the second group of checks deposited at BOTT, the absence of evidence supporting such a reading and the fact that the handwriting is the same in all three lines of the writing militate against such a construction. Moreover, in this case, the "x" on the first line, which usually indicates where the signature should appear, supports the more logical interpretation: the payee named on the front of the check, DCC, signed where indicated by the "x" and added below that its instructions that the check be accepted for deposit into the ABR account.

C. *Checks Deposited at RNB*

The endorsements on the checks deposited at RNB are analytically identical to those deposited at BOTT. The one check in the first category, for $1,000.00, was endorsed: "for deposit only/310263719/Diamond Capital." *See* Trager Aff. Supp. Cross-Mot. & Opp. Defs.' Mots. Ex. I. The two checks in the second group, totaling $5839.98, were endorsed as follows: "for deposit only/Diamond Capital/310263719." *See* Trager Aff. Supp. Cross-Mot. & Opp. Defs.' Mots. Ex. H. [FN10] The four checks in the third group, totaling $46,359.97, were endorsed in three forms, similar for analytical pur-

poses in that none of the endorsements contained a signature in DCC's name. [FN11] *See* Trager Aff. Supp. Cross-Mot. & Opp. Defs.' Mots. Ex. G. [FN12]

FN10. The check in Exhibit H that is dated February 27, 1992 matches the description in Complaint ¶ 58, which lists a check deposited in March of 1992, dated February 27, 1992, and for the sum of $2,919.99. However, the Complaint's description of the endorsement does not match the exhibit; apparently, this description was inadvertently switched with the description of the endorsement on the check listed in Complaint ¶ 64. Because the copies of the checks are before the Court, the Court will assume that the Complaint simply reflects a typographical error.

FN11. The checks were endorsed as follows: (1) two checks with a rubber stamp reading "Pay to the order of/Republic National Bank/ for deposit only/International Diamond/Capital Corp./310263719; (2) one check in handwriting, "for deposit only/310263719/International Diamond"; and (3) one check in handwriting, "for deposit only/ Starace Equities/310263689.

FN12. The check included in Exhibit G that is dated October 27, 1992 is described in Complaint ¶ 64 with the exception that the Complaint incorrectly describes the endorsement. As noted previously, the Court will assume that the Complaint is in error.

The result as to each group of checks is identical to the results stated above as to the three categories of checks deposited at BOTT, for the reasons stated above with respect to BOTT's conduct. In each case, RNB deposited the funds in accordance with the restrictive endorsement. Accordingly, summary judgment in RNB's favor is appropriate as to the claims alleging violation of a restrictive endorsement.

IV. *Statutory Claims for Payment on a Forged Endorsement*

**\*9** An endorser can use any name, fictitious name,

Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

or mark in making a signature, but, in order to be effective, the endorsement must include an authorized signature. *See* N.Y. U.C.C. §§ 3-401, 3-404 (McKinney 1991). An "unauthorized" signature under the Code includes both forged signatures and signatures made by an agent or representative acting outside of his actual or apparent authority. *See* N.Y. U.C.C. § 1-201(43) (McKinney 1993).

A. *Authority to Endorse on DCC's Behalf*

Plaintiff claims that defendant banks violated section 3-419(1)(c) of the Code when they negotiated the checks based on endorsements by Mr. Starace because, plaintiff asserts, Mr. Starace lacked actual authority to endorse checks on DCC's behalf. Plaintiff does not dispute the existence of the Agreement -- signed by Mr. Starace, Steven Kravitz (President of DCC), Diana Ortado (Executive Vice President and Corporate Secretary of DCC), and Martin Levine (Vice Chairman and Vice President of DCC) -- which purports to confer on Mr. Starace control of the day-to-day operation of DCC. FN13 Rather, plaintiff argues that the Agreement is without legal effect because Mr. Starace was never approved by the SBA, as required by federal regulation. *See* 13 C.F.R. § 107.106(c) (1995) ("Without prior written approval of SBA, ... no officer, director, employee or other Person acting on the Licensee's behalf shall ... [p]ermit the proposed new owner to ... participate in any manner in the conduct of Licensee's affairs.").

> FN13. In fact, plaintiff stipulates to the fact that DCC's officers and/or directors authorized Mr. Starace to endorse its checks. Hritz Aff. Ex. J; Buckley Aff. J.

Thus, the SBA's regulations prohibit its licensees from entering, without prior written approval, agreements like that purportedly made by DCC and Mr. Starace. However, the New York Court of Appeals has held that an agreement made in violation of an SBA regulation is not necessarily void. *See Lloyd Capital Corp. v. Pat Henchar, Inc.,* 80 N.Y.2d 124, 128, 589 N.Y.S.2d 396, 398, 603 N.E.2d 246, 248 (1992), *aff'g* 152 A.D.2d 725, 727, 544 N.Y.S.2d 178, 180 (1989); *see also United States v. Fidelity Capital Corp.,* 920 F.2d 827, 831, 838 n.39 (11th Cir. 1991) (citing *Talco*

*Capital Corp. v. Canaveral Int'l Corp.,* 225 F. Supp. 1007, 1013-14 (S.D. Fla. 1964), *aff'd,* 344 F.2d 962 (5th Cir. 1965)); *General Venture Capital Corp. v. Wilder Transp.,* 26 N.Y.2d 173, 178, 271 N.Y.S.2d 805, 811 (1966). Nothing in the regulations or statutes governing SBICs indicates that a violation of 13 C.F.R. § 107.106(c) renders a contract void and unenforceable. Rather, a violation of the regulation can lead to revocation of the SBIC's license or other actions by the SBA against the SBIC or its officers. Although "[i]llegal contracts are, as a general rule, unenforceable," agreements violating regulations that "are merely malum prohibitum" have been excepted from the general rule. *Lloyd Capital Corp.,* 80 N.Y.2d at 127, 589 N.Y.S.2d at 397, 603 N.E.2d at 247 (quoting *John E. Rosasco Creameries, Inc. v. Cohen,* 276 N.Y. 274, 278, 11 N.E.2d 908, 909 (1937)) (internal quotation marks omitted).

**\*10** To determine whether a given statute renders void any contract made in violation of it, New York courts have generally looked first to whether the statute was enacted to protect public health and safety, and whether the party seeking to assert the defense of illegality is part of the class of persons intended to be protected. *See Richards Conditioning Corp. v. Oleet,* 21 N.Y.2d 895, 896, 289 N.Y.S.2d 411, 412, 236 N.E.2d 639, 640 (1968); *John E. Rosasco Creameries,* 276 N.Y. at 280, 11 N.E. at 910 (holding that, where violation of a licensing statute did not endanger the public health, and where the statute was intended to protect milk producers and the consuming public, defendant milk dealers could not avoid their contracts with an unlicensed dealer based on its failure to obtain a license). Furthermore, "[a]llowing parties to avoid their contractual obligation is especially inappropriate where there are regulatory sanctions and statutory penalties in place to redress violations of the law." *Lloyd Capital Corp.,* 80 N.Y.2d at 128, 589 N.Y.S.2d at 398, 603 N.E.2d at 248. Finally, the New York Court of Appeals has recognized the principle that "forfeitures by operation of law are disfavored, particularly where a defaulting party seeks to raise illegality as 'a sword for personal gain rather than a shield for the public good.'" *Id.* (quoting *Charlebois v. Weller Assocs.,* 72 N.Y.2d 587, 595, 535 N.Y.S.2d 356, 360, 531 N.E.2d 1288, 1292 (1988)).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

Application of these principles in the instant case is somewhat novel, because the case is unlike the situation presented in the typical cases, where a defendant asserts the illegality of a contract in order to excuse its default. Nevertheless, nothing in the cited cases indicates that the principles outlined should not be applied to a party seeking to avoid, based on illegality, the effects of its own contract insofar as the contract affects third parties. First, the regulation in question was not enacted to protect public health or safety. As a general matter, the purpose of the Federal Small Business Investment Act ("SBIA") is to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise," and the SBIA "is concerned not with public health or safety, but with carrying out Federal small business policy." *Id.* (quoting 15 U.S.C. § 631(a)) (internal quotation marks omitted). The specific SBA regulation asserted by plaintiff is evidently intended to protect the public from fraud by ensuring that the overseeing agency approves those controlling SBICs as properly qualified to run such institutions. *See* 13 C.F.R. 107.101-.103 (detailing the required qualifications). Second, plaintiff, which sues in its capacity as DCC's receiver, is not part of the class of persons intended to be protected -- quite to the contrary, DCC is a member of the class of entities sought to be regulated.

In terms of regulatory sanctions imposed by the SBIA for enforcement of the regulations, the SBA is empowered to forfeit the SBIC's rights, privileges, and franchises under the SBIA or to dissolve the SBIC; to issue cease and desist orders or to revoke or suspend the SBIC's license; to enjoin the offending conduct, or to impose fines on corporate officers for violation of SBA's regulations. *See* 15 U.S.C. §§ 637(d), 637a, 637c, 637g (1994). Furthermore, the SBA can sue the responsible director or officer for damages to the SBIC resulting from conduct in violation of the regulations. *See, e.g., Small Bus. Admin. v. Segal,* 383 F. Supp. 198 (D. Conn. 1974). Thus, DCC itself, or Ms. Ortado and Messrs. Levine and Kravitz, could be sanctioned for entering into the Agreement. The regulatory sanctions make it clear that avoidance of an SBIC's contract for violation of a regulation is not indicated. In the context

of this regulatory scheme, allowing plaintiff to void the contract as it affects these defendants would be inappropriate.

**\*11** Indeed, to allow plaintiff to assert the regulation in order to avoid the effect of DCC's own irresponsible actions in granting operational control to Mr. Starace would lead to a particularly perverse result in this case. DCC, the licensee which violated the regulation by entering into the Agreement in the first place would, if its illegality argument were accepted, be allowed to shift liability to defendants, who had no hand in the formation of the contract. Plaintiff should not be able to wield the regulation as a sword for private gain. DCC cloaked Mr. Starace with at least the apparent authority to act on its behalf, and gave him operational control of the corporation such that, on a practical level, he controlled the corporation's cash-flow and had access to the checks in question. If DCC acted unlawfully in doing so, it should not now be able to complain of its own misconduct in order to avoid consequences it alleges to have resulted from its own delegation of authority. [FN14] This Court therefore finds that for the purposes of the payee's claim under Code section 3-419(1)(c), the Agreement was sufficient as a matter of law to vest in Mr. Starace the authority to endorse checks on DCC's behalf. Accordingly, summary judgment must be granted in defendants' favor on plaintiff's section 3-419(1)(c) claims with respect to the checks endorsed in DCC's name.

FN14. The fact that the SBA is the named plaintiff asserting the illegality of DCC's conduct does not change the result. The SBA sues in its capacity as receiver and thus stands in DCC's shoes. *See, e.g., Armstrong v. McAlpin,* 699 F.2d 79, 89 (2d Cir. 1983) ("A receiver stands in the shoes of the person for whom he has been appointed and can assert only those claims which that person could have asserted."). Thus, because DCC could not assert the illegality of its own contract in order to place liability on defendant banks, plaintiff cannot avoid the effect of the contract.

B. *Checks Lacking Endorsement on DCC's Behalf*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

In addition to the checks bearing Mr. Starace's endorsements for DCC, however, there are at issue a number of checks that were not endorsed on DCC's behalf at all. These are the checks referred to in Part III above as the third group of checks deposited at BOTT and at RNB, and the first check deposited at Citibank. Because no signature in the name of the payee (DCC) appears in the endorsements, the checks on their face appear never to have been negotiated to the owners of the accounts into which the funds were deposited. Payment of an instrument lacking an endorsement constitutes conversion, and normally there would be no remaining issues of fact under such circumstances. *See, e.g., Home Ins. Co. v. Manufacturers Hanover Trust Co.,* 20 U.C.C. Rep. Serv. 2d (CBC) 220 (Sup. Ct. 1994), *aff'd* 203 A.D.2d 125, 610 N.Y.S.2d 508 (1994); *Costello v. Oneida Nat'l Bank & Trust Co.,* 109 A.D.2d 1085, 1086, 487 N.Y.S.2d 238, 239, *aff'd* 66 N.Y.2d 619, 495 N.Y.S.2d 32, 485 N.E.2d 239 (1985). However, in this case, material issues of disputed fact remain as to the check deposited at Citibank.

The first check deposited at Citibank was not endorsed by DCC, but rather by Citibank with a "PEG" endorsement under Code section 4-205. Such an endorsement, if made on behalf of a customer, is not a forgery. *See Marine Midland Bank,* 57 N.Y.2d at 227, 455 N.Y.S.2d at 569, 441 N.E.2d at 1087. However, as noted above in Part III.B, a material issue of disputed fact remains as to whether the ABR account was maintained for DCC's benefit such that DCC can be deemed to be Citibank's customer. Accordingly, summary judgment cannot be granted in either party's favor as to the section 3-419(1)(c) claim on this check.

**\*12** With regard to the checks without DCC's endorsement that were deposited at BOTT and RNB, no issues of fact remain. No signature in DCC's name appears on any of the checks, and neither bank attempted to supply a missing endorsement on DCC's behalf, as Citibank did, with a "PEG" endorsement. Defendant BOTT urges that Code section 3-401 allows any name or mark to be used as a signature. However, this argument involves a strained reading of both the statute and the endorsements. The endorsements contain only (1)

words indicating a restriction ("for deposit"); and (2) words identifying IDCC, whether by its account number alone or also by the words "International Diamond Capital." The restrictive words surely cannot be read as having been intended or accepted as a mark on DCC's behalf. Similarly, the words identifying IDCC cannot be so construed. As to the checks including only the account number, if the number were accepted as a mark on DCC's behalf, then BOTT should not have deposited the funds in an account other than one belonging to DCC. As to the checks with both the account number and the name, it is scarcely credible to interpret the one as a mark on DCC's behalf while interpreting the other as naming a transferee, since BOTT's account record would show that the number and the name identify the same entity -- IDCC, not DCC. [FN15] Therefore, as to the checks lacking endorsement in DCC's name and deposited at BOTT and RNB, plaintiff's motion for summary judgment is granted.

FN15. Defendant's argument, based on *Latallo Establissement v. Morgan Guaranty Trust Co.,* 155 A.D.2d 214, 218-19, 553 N.Y.S.2d 686, 689 (1990), is also unconvincing. In that case, a mother and son were both authorized signatories for an account, each being empowered to sign singly. The son, for reasons of his own, endorsed instructions to the defendant bank not in his own name, but in his mother's name. The court held that "whatever name son Guillermo signed on the written instructions, it is clear that he was empowered to direct the transfers of money," and the bank therefore was not negligent. *Id.* at 218. This language, when quoted out of context, appears to mean that Mr. Starace, who had at least apparent authority to endorse on DCC's behalf, could sign using "whatever name." However, in the context of the facts of the case, it appears that the son's endorsement was held effective because he had authority to sign *and* he signed the name of an authorized endorser. The case is inapposite here, because no signature in DCC's name appears at all.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

V. *Summary of Holdings*

The motion to strike plaintiff's affidavits is granted in part with respect to the first and third affidavits, and denied with respect to the second affidavit. Accordingly, the affidavit statements that remain are the exhibits attached to the first affidavit, the entirety of the second affidavit, and the first five sentences of the fifth paragraph of the third affidavit, along with the exhibits attached to the third affidavit.

The motion dismiss the common law claim for commercially unreasonable practice in paying an instrument on a forged endorsement is granted as to all defendants.

BOTT's motion for summary judgment on the claims for applying funds inconsistently with restrictive endorsements, in violation of section 3-206(3) of the NYUCC and as contrary to commercially reasonable practice, is granted with respect to all of the checks deposited at BOTT (enumerated in Complaint ¶¶ 17, 19, 21, 23, 25, 27, 29, 31, 33, 35, 37, 39, 41, 43, and 45). Citibank's motion for summary judgment on the same claims is granted with respect to the check dated March 28, 1991, in the amount of $82,684.93 (enumerated in Complaint ¶ 84); the motion is denied with respect to the other check (enumerated in Complaint ¶ 82). RNB's motion for summary judgment on the same claims is granted with respect to all of the checks deposited at RNB (enumerated in Complaint ¶¶ 54, 56, 58, 60, 62, and 64).

Defendants' motions for summary judgment on the claims for payment of an instrument on a forged endorsement, in violation of section 3-419(1)(c), are granted to each defendant respectively, with respect to the following checks:

| Bank | Date | Amount | Complaint ¶ |
|---|---|---|---|
| BOTT | 09/01/91 | $ 2,418.55 | 21 |
| | 10/01/91 | 2,418.55 | 23 |
| | 11/01/91 | 2,418.55 | 25 |
| | 12/01/91 | 2,418.55 | 27 |
| | 08/20/91 | 81,221.29 | 35 |
| | 10/01/91 | 46,020.05 | 37 |
| | 10/11/91 | 10,382.00 | 39 |
| | 11/11/91 | 100,000.00 | 41 |
| | 11/21/91 | 90,000.00 | 43 |
| | 12/20/91 | 32,199.02 | 45 |
| RNB | 01/31/91 | 1,000.00 | 56 |
| | 02/27/92 | 2,919.99 | 58 |
| | 03/20/92 | 2,919.99 | 60 |
| Citibank | 03/28/91 | 82,684.93 | 84 |

**\*13** Plaintiff's cross-motion for summary judgment on its claim of payment of an instrument on a forged endorsement in violation of section 3-419(1)(c) is denied with respect to the check dated March 22, 1991, in the amount of $80,000.00, and deposited at Citibank (enumerated in Complaint ¶ 82).

Plaintiff's cross-motion for summary judgment on the same claim is granted with respect to the following checks:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795
**(Cite as: 1997 WL 45514 (S.D.N.Y.))**

| Bank | Date | Amount | Complaint ¶ |
|------|------|--------|-------------|
| BOTT | 07/01/91 | $ 2,418.55 | 17 |
| | 08/01/91 | 2,418.55 | 19 |
| | 08/01/91 | 60,000.00 | 29 |
| | 08/02/91 | 7,201.00 | 31 |
| | 08/02/91 | 2,297.70 | 33 |
| RNB | 01/31/92 | 519.99 | 54 |
| | 03/26/92 | 40,000.00 | 62 |
| | 10/27/92 | 2,919.99 | 64 |
| | 07/27/92 | 2,919.99 | 73 |

Accordingly, the issues that remain in the case are: (1) the claim for violation of section 3-206(3) or commercially unreasonable practice in applying funds inconsistently with the restrictive endorsement on the check, dated March 22, 1991, in the amount of $80,000.00, and deposited at Citibank (enumerated in Complaint ¶ 82); and (2) the claim for violation of section 3-419(1)(c) with respect to the same check.

CONCLUSION

For the reasons stated above, the motions to strike plaintiff's affidavits are HEREBY GRANTED in part. The motion to dismiss the common law claim for payment on a forged endorsement is HEREBY GRANTED. Defendants' motions for summary judgment are HEREBY GRANTED in part, and plaintiff's cross-motion for summary judgment is HEREBY GRANTED in part.

The parties are directed to appear for a pre-trial conference at 500 Pearl Street in Courtroom 18B, at 11:30 a.m. on February 28, 1997.

SO ORDERED

S.D.N.Y.,1997.
U.S. Small Business Admin. v. Citibank, N.A.
Not Reported in F.Supp., 1997 WL 45514 (S.D.N.Y.), 31 UCC Rep.Serv.2d 795

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.