UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
UTICA MUTUAL INSURANCE COMPANY,

                        Plaintiff,

    - against –

MUNICH REINSURANCE AMERICA, INC.,

                        Defendant.
-----------------------------------------------------------------------X

No. 12-CV-00196 (BKS/ATB)

-----------------------------------------------------------------------X
MUNICH REINSURANCE AMERICA, INC.,

                        Plaintiff,

    - against –

UTICA MUTUAL INSURANCE COMPANY,

                        Defendant.
-----------------------------------------------------------------------X

No. 13-CV-00743 (BKS/ATB)

## DEFENDANT MRAM'S OPPOSITION TO UTICA'S REQUEST FOR ADMISSION OF *CANNON ELECTRIC* TRANSCRIPTS

MRAm opposes Utica's request that this Court admit into evidence excerpts from depositions and trial testimony previously taken in the *Cannon Electric* litigation. In its recent brief on this issue (12-cv-0196, Dkt. 406), Utica has requested admission of certain excerpts from the testimony of Barry Bradshaw (of Goulds), Thomas Caveny (of Marsh, a broker), John Cizza, Dan Daly, Marcia Schilling, and Daniel Stedman taken in the *Cannon Electric* litigation. Utica bases its request, in part, on FRCP 32(a)(8).

FRCP 32(a)(8) provides that depositions taken in another action "*may* be used" if the necessary prerequisites are met. Even if Utica can meet the requirements set forth in FRCP

32(a)(8), whether to admit these transcripts is still within this Court's discretion. MRAm objects to the use of excerpts from these transcripts because, even if Utica can satisfy FRCP 32(a)(8), the designated testimony is irrelevant, as well as duplicative of the testimony given at trial. Therefore, MRAm requests that the Court exercise its discretion and decline to admit these deposition transcripts.

**A.     Utica's Witnesses Admitted at Trial That Utica Paid Consideration to Goulds in Exchange for Goulds' Agreement to Impute Aggregate Limits into the <u>Primary Policies</u>.**

The designated testimony should not be admitted into evidence because the admissions of Utica's witnesses at trial supersedes the designated testimony that Utica seeks to have admitted concerning aggregate limits. During trial, at least two of Utica's witnesses admitted on cross-examination that some portion[1] of Utica's payment under the Settlement Agreement was consideration for Goulds' agreement to impute aggregate limits into the primary policies issued without them.

Kristen Martin testified as follows:

> Q    Do you acknowledge today that Utica paid additional amounts of money to Goulds in exchange for Goulds' agreements to grant aggregate limits to primary policies issued without them?
>
> A    Utica afforded Goulds additional money to settle asbestos claims up to $325 million and Goulds agreed that we did indeed have aggregates on our policies. So, yes, I will agree to that statement.
>
> *               *               *
>
> Q    ... Is it your statement that none of the settlement payment was in exchange for Goulds' agreement to impute aggregate limits into the Utica primary policies that were issued without them?

---

[1] MRAm, of course, maintains that the evidence supports the conclusion that all of the additional policy limits Utica granted to Goulds in their settlement were in exchange for Goulds' agreement to grant "peace on aggregates."

> A   No.

(Trial Transcript ("TT") at 708-709)

Bernard Turi testified as follows:

> Q   So is it fair to characterize this note [D-545] as expressing Utica's willingness to give certain consideration to Goulds in exchange for Goulds agreeing that all of Utica's primary policies contain aggregate limits?
>
> A   Yes. I think this is sort of perhaps maybe the first coalescence of the strategy that I had outlined and we see it in many places where, you know, Goulds had a -- Goulds argued we didn't have aggregate, and we had among other things an orphan share account, and so there is a discussion that this would be a tradeoff or a compromise on these issues because, you know, we had litigation risk. So I think that's – I think that's right.

(TT at 1406)   And further:

> Q   At all times during the course of the negotiations, the settlement negotiations between Goulds and Utica, isn't it true that Goulds always demanded an amount of money in exchange to grant Utica peace on aggregates?
>
> A   I think that was their strategy, yes. I think they were demanding some number over and above the limits, I can't say every time, but I do recall that frequently, sure.
>
> Q   And you want this Court to believe that Utica – that Goulds walked away from that demand in exchange for nothing?
>
> A   No, I didn't say that. I said that we had conceded on the orphan share issue and that we had significant evidence that there were aggregate limits, and as the case went on we developed more of that evidence.
>
> . . . So I didn't say Goulds walked away with nothing. I said that Goulds, we did concede on the orphan share, we did give them a right under the agreement to assist with the selection of coordinating counsel. But I think Goulds recognized the plethora of evidence on the aggregate issue as well, and I think that was a risk for them as well, that they would lose that issue.

(TT at 1400-1401)[2]

Although he was evasive, William Savino did not deny that Utica agreed to exchange extra limits in its umbrella policies for aggregate limits in its primary policies.

> Q   Now if you go down to, I suppose it's 3C, if we could highlight that. You don't refer to the extra limits that Utica is offering as supplemental defense, do you?
>
> \*           \*           \*
>
> Q   Okay. I'll ask it in a different way. Isn't your reference here to extra limits the additional limits that Goulds agreed to grant to Goulds under its policies in exchange for peace on the aggregates?
>
> A   I cannot say that with certainty, but I don't believe it's unreasonable.

(TT at 1707)

The designated testimony that Utica seeks to have admitted concerns whether there were aggregate limits in Utica's primary policies. Since Utica's witnesses have already admitted before this Court that they paid to compromise that issue, evidence regarding their original intent is no longer material, nor will it assist in resolving any issue currently before this Court. In other words, all of that deposition testimony is irrelevant.

In addition, the designated testimony is inconsistent with the contemporaneous documents. The contemporaneous documents are objective indicators of Utica's and Goulds' intent[3] at the time of underwriting, and are more reliable than after-the-fact testimony.[4]

---

[2] Mr. Turi also admitted during trial that "Utica was prepared to go to the mediation and trade dollars for compromise on the aggregate issue" (TT at 1424), and that it was his understanding and strategy" to have some consideration to the orphan share amount that Goulds owed versus the aggregates issue." (TT at 1426)

[3] For instance, Mr. Bradshaw drafted a letter in 1974 (D-6) requesting that Utica provide defense coverage after exhaustion of primary policies. This letter indicates that he believed that such coverage was not provided by the Defense Endorsement.

B.  **The Defendant Insurers in the *Cannon Electric* Litigation Did Not Have the Same Motive to Question the Deponents as MRAm.**

Utica claims that the excess insurers had the same motive as MRAm to examine the witnesses, even if they did not have all of the documents that MRAm has obtained during discovery. This is simply untrue.

MRAm was not an insurer of Goulds. It was a named defendant in the *Cannon Electric* litigation only because it issued excess insurance policies to ITT, an entity that had purchased Goulds in 1996. Consequently, it had no interest or motive in questioning witnesses regarding Goulds or Goulds' insurance coverage.

Moreover, while other excess insurers of Goulds may have had motive to establish that certain Utica primary policies issued to Goulds lacked aggregate limits, MRAm did not have the same motive. MRAm did not have to establish at trial in these matters that Utica's primary policies were issued without stating aggregate limits. Nor did MRAm have to attempt to overcome Utica's or Goulds' evidence as to the original intent[5] regarding aggregate limits. Thus, if MRAm had deposed these individuals in the present matters, MRAm's deposition questioning would have related to the same issue that was presented to this Court at trial – *i.e.*, whether Utica's reinsurance allocation was lacking in good faith and was unreasonable based on the

---

[4]  Even if otherwise admissible, Mr. Bradshaw's vague, 30-years-after-the-fact testimony concerning his unexpressed intent to have "coverage [that] was uniform from bottom to top" (12-cv-0196, Dkt. 350-5 at 57 (Tr. at 53)) is ambiguous, and in any event, is not contemporaneous evidence of an intent by Goulds to obtain umbrella policy coverage providing expense costs in addition to limits. Mr. Bradshaw also testified during his deposition that he did not have a current understanding "of whether that defense obligation [in the Defense Endorsement] applies where an occurrence is covered by the underlying Utica primary?" (Tr. at 151:11-152:4)

[5]  It should be kept in mind that in *Cannon Electric*, Goulds – and not Utica – had to establish that the primary policies were intended to state aggregate limits. MRAm never had to confront that issue, because in the context of the Utica-MRAm reinsurance dispute, Goulds was taking the exact opposite position.

dynamics of the settlement negotiations with Goulds and the exposures that Utica faced because it issued unaggregated primary policies.[6]

In addition, Goulds' other excess insurers did not have the same ability to examine witnesses in the *Cannon Electric* litigation because they lacked critical documents that MRAm possesses. MRAm has access to a great many documents on key issues that Goulds' excess insurers would not have known to request and/or could not have obtained. Included in those inaccessible categories are i) the privileged and work-product documents of Utica's counsel in that matter, and ii) information concerning other insureds where Utica also issued primary policies that lacked aggregate limits. MRAm obtained such documents during its litigation with Utica, and questioned the witnesses it deposed on these documents.[7]

Contrary to Utica's claim, this is not a situation where the excess insurers in the *Cannon Electric* litigation were aware of an issue that also exists in these litigations, but those insurers were simply lacking documents to support a particular line of questions. In the *Cannon Electric* matter, because the excess insurers lacked the documents that MRAm has, they lacked all knowledge of key arguments concerning the aggregate limits issue. Without that knowledge, they had no reason – no 'motive' – to ask any questions on those issues. Specifically, they did

---

[6] If MRAm had been present at the depositions of these individuals in its capacity as an *in*surer of ITT, its questioning would have focused on establishing that its policies issued to ITT did not provide any coverage to Goulds for any loss, regardless of whether there were aggregates in the primary policies that Utica issued to Goulds.

[7] There are numerous instances of MRAm questioning Utica's witnesses regarding documents that were inaccessible to Goulds's other excess insurers. Some examples include: Trial exhibit D-29 was marked and discussed at Kristin Martin's deposition as exhibit 29 (Dkt. 301-94 at 269-273), and Ronald Robinson was also questioned regarding the document. (Dkt. 301-92 at 140-146) Trial exhibits D-50, D-72 and D-76 were marked and discussed at the deposition of Bernard Turi as exhibits 50, 72 and 76, respectively. (Dkt. 313-121 at 129-143, 236-247, 263-264) William Savino was also questioned regarding documents 50 and 72. (Dkt. 301-88 at 65-71 and 153-183) Anthony Paolozzi was questioned regarding document 76. (Dkt. 313-167 at 107-113) Ms. Martin, Mr. Robinson and John Griffin were all questioned regarding the lack of aggregate limits in policies issued to other insureds. (Dkt. 301-94 at 72 (Martin); Dkt. 301-92 at 204-206 (Robinson), and Dkt. 345-2 at 112-125 (Griffin))

not know that the lack of aggregate limits in Utica's primary policies was the primary point of negotiation in the settlement negotiations between Utica and Goulds. They also did not know that Utica's failure to state aggregate limits in the Goulds policies was a recurring problem. Since they had no knowledge of these points, they had no motive to ask questions concerning them. In fact, none of the witnesses whose deposition testimony Utica now seeks to have admitted were asked even one question regarding the settlement between Utica and Goulds, or about policies issued to other insureds.

### C.   The Testimony Utica Seeks to Have Admitted is Duplicative.

Since Utica and MRAm did not reach an agreement prior to trial regarding the admission of deposition testimony from the *Cannon Electric* litigation, Utica presented live testimony at trial, and submitted designated testimony from depositions taken by MRAm in these cases concerning the issue of aggregate limits. Therefore, Utica's designations of testimony from the *Cannon Electric* matter is now duplicative. Utica presented at least three live witnesses who testified concerning the intent to have aggregate limits in its primary policies – Marcia Schilling, Kristen Martin and Bernard Turi. The parties have also stipulated to the admission of designations from the depositions of John Griffin and Ronald Robinson. There is no reason for this Court to spend even more time reviewing duplicative testimony on this issue, which is largely moot based upon Utica's admissions at trial.

### D.   Marcia Schilling Testified at Trial.

Although Utica previously argued that MRAm could not designate deposition transcripts of Utica's witnesses that it would be calling to testify at trial[8], Utica now seeks admission of portions of the deposition transcript of Marcia Schilling. The Court will recall that Ms. Schilling testified on Tuesday, July 10, 2018, and the topics of her testimony included: how she rated policies, whether she could rate a primary policy that did not have an aggregate limit; identifying her handwriting on policy documents, her interactions with reinsurers; and whether Utica had a procedure of notifying reinsurers of endorsements. The portions of Ms. Schilling's prior deposition testimony that Utica has designated, and seeks to have admitted, include: how she rated policies, whether she could rate a policy that did not have an aggregate limit, and identifying her handwriting on policy documents. Thus, Ms. Schilling's deposition testimony is duplicative of her trial testimony and should not be admitted.[9]

Moreover, MRAm had the opportunity to effectively cross-examine Ms. Schilling during trial and utilized documents that were otherwise inaccessible to the excess insurers in the *Cannon Electric* litigation. For example, Ms. Schilling first testified that Utica made a "mistake" or a "scrivener's error" when it issued primary policies to Goulds without stating a products aggregate limit. (TT at 322:20-322:22; 334:19-334:21) But during re-cross examination, MRAm introduced a document drafted by Utica's coverage counsel (James Seal and Ronald

---

[8] *See* Utica's Objections to Munich's Deposition Designations (12-cv-0196, Dkt. 398), which provides, "Utica objects to Munich Re's designations of [John Griffin, Daniel Hammond, Kristen Martin, Ernext Merrill, Bernard Turi, and Stefanie Walterick] because these witnesses will testify at trial, as Utica has informed Munich Re."

[9] Ms. Schilling's direct trial testimony does lack the specificity of her testimony during her earlier deposition on the topics that overlap. However, Utica's counsel was free to ask more detailed questions, in order to elicit all of the information that was obtained from Ms. Schilling during her deposition on those topics. (The Court may recall that proceedings ended over an hour early on the day that Ms. Schilling testified (TT at 392), because Utica had no more witnesses available to testify.) The fact that counsel called this witness and then failed to ask sufficiently detailed questions is not a reason to admit her prior deposition testimony.

Robinson of the Berkes Crane law firm) that called into question whether Utica made a mere "mistake" in issuing primary policies without stating an aggregate limit:

> The suggestion that the Utica policies contain a 'typographical or scrivener's error' because the aggregate limit may not be clearly set forth on the 'aggregate limit' line is contrary to the evidence we have gathered from Utica personnel familiar with the preparation of these policies. The Utica personnel we have talked to do *not* believe that these policies contain typographical or scrivener's errors. The decision to include a single typed reference to occurrence and aggregate limits on a line between the two references to limits in the policy was not made inadvertently or in error.

(emphasis in original)

\*     \*     \*

> As Ron has previously explained to you (and as demonstrated in drafting history memoranda prepared by Brooks Weld which has been sent to you), the industry drafting history supports the argument that insurers should adhere to a custom and practice of clearly highlighting the aggregate limits of coverage, a practice which Utica arguably did not follow in preparing the policies at issue here. Indeed, the information we have obtained from Utica personnel (in particular, Marsha Dodge [Schilling]) is that Utica eventually abandoned the practice of noting both per occurrence and aggregate limits by use of a single typed reference in the policy between the lines provided for each designation of limits precisely because of concern that Utica's practice was not consistent with sound industry practice of unequivocally designating the limits of coverage.

(*See* D-175 at F-0121012 and 0121016 and TT at 359:20-363:8) These type of impeachment documents were not available to excess insurers and permitted Utica witnesses (and Utica's counsel) to construct an after-the-fact narrative that was immune from effective cross-examination.

Utica should not be permitted to offer Ms. Schilling's deposition transcript to "cure" any deficiencies in her trial testimony.

E.  **Daniel Stedman Was Not Involved in the Utica Account Until 1984.**

In his deposition transcript, Mr. Stedman indicates that he joined Utica in 1980 as an underwriting trainee, but did not join the National Accounts division within Utica (where the Goulds account was underwritten) until 1984. (Dkt. 351-4 at 7 (Tr. at 25-26))  Due to his late involvement in the Goulds account, Mr. Stedman could not have had any involvement in the underwriting of the primary policies which were issued to Goulds without aggregate limits. Therefore, his testimony is irrelevant and should not be admitted.

Dated: New York, NY
  July 30, 2018

RUBIN, FIORELLA & FRIEDMAN LLP

By: _____
Bruce M. Friedman, Esq. (N.D.N.Y Bar No. 106918)
Crystal Monahan (N.D.N.Y. Bar No. 603020)
Jason Eson (N.D.N.Y. Bar No. 520194)

RUBIN, FIORELLA & FRIEDMAN LLP
Attorneys for Munich Reinsurance America, Inc.
630 Third Avenue, 3rd Floor
New York, New York 10017
(212) 953-2381
(212) 953-2462 fax

4817-8308-0558, v. 1